Michael T. JELINEK, M.D. and Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital, Petitioners,

v.

Francisco CASAS and Alfredo DeLeon, Jr., as Personal Representatives of the Estate of Eloisa Casas, Deceased, Respondents.

No. 08–1066.

Supreme Court of Texas.

Argued Feb. 18, 2010.

Decided Dec. 3, 2010.

---

Ronald G. Hole, Ida Cecilia Garza, Hole & Alvarez, L.L.P., McAllen, for Michael T. Jelinek, M.D.

John N. Mastin, San Antonio, Francisco J. Rodriguez, Rodriguez Tovar & Lopez, LLP, McAllen, for Francisco Casas.

Mike A. Hatchell, Sarah B. Duncan, Elissa Gail Underwood, Locke Lord Bissell & Liddell, LLP, Austin, Raul Javier Guerra, Green, DuBois & Guerra, San Antonio, Susan A. Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, for Columbia Rio Grande Healthcare, L.P.

Justice GUZMAN delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined, and in which Chief Justice JEFFERSON, Justice GREEN, and Justice LEHRMANN joined as to Parts I and II.A.

When circumstantial evidence is consistent with several possible medical conclusions, only one of which establishes that the defendant's negligence caused the plaintiff's injury, an expert witness must explain why, based on the particular facts of the case, that conclusion is medically superior to the others. If the expert fails to give any reason beyond an unsupported opinion, the expert's testimony is legally insufficient evidence of causation. In this case, we determine whether legally sufficient evidence supports the jury's verdict in favor of the estate of Eloisa Casas[1] against Rio Grande Regional Hospital (the Hospital).[2] Following her admission to the Hospital with abdominal pain, doctors placed Casas on antibiotics used to treat and prevent certain intra-abdominal infections. Two days later she underwent major abdominal surgery and continued on the antibiotics for another five days, but the Hospital allowed the prescriptions to lapse for four-and-a-half days. The Hospital admits it should have continued the antibiotics but denies that the lapse caused Casas any additional pain. We hold that the Casases failed to present legally sufficient evidence that Casas suffered from an infection the omitted antibiotics would have treated. Accordingly, we reverse the court of appeals' judgment and render judgment that the Casases take nothing.[3]

In a separate petition, Dr. Michael Jelinek, one of Casas's treating physicians sued by the Casases, argues that the trial court should have granted his motion for sanctions and dismissal because the Casases' expert report was deficient. We agree and hold that an award of attorney's fees is proper. Therefore, we reverse and remand to the trial court for an award of attorney's fees and costs.

---

1. Francisco Casas and Alfredo DeLeon Jr., Casas's husband and son, respectively, serve as personal representatives of her estate. We refer to them collectively as "the Casases."

2. Columbia Rio Grande Regional Healthcare, L.P., d/b/a/ Rio Grande Regional Hospital.

3. Because we conclude legally insufficient evidence supports the jury's verdict, we do not reach the Hospital's second issue—whether the Hospital preserved error regarding its proposed unavoidable accident instruction.

## I. Background

In 2000, Eloisa Casas was diagnosed with colon cancer and underwent surgery, radiation, and chemotherapy. A year later, doctors told her that the cancer appeared to be in remission, and she thought she was cured. But on July 10, 2001, she was admitted to the Hospital with abdominal pains; she also had a fever and a mildly elevated white-blood-cell count, potentially indicating an infection. To treat this possible infection, her surgeon and primary physician, Dr. Carlos Garcia–Cantu, consulted with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic bacteria).

The Hospital performed several diagnostic tests, which revealed abnormal collections of fluid in Casas's abdomen. On July 13, she underwent major abdominal surgery during which Dr. Garcia–Cantu discovered that "fairly extensive" metastatic cancer had perforated Casas's colon and allowed material to leak into her abdominal cavity, causing an intra-abdominal abscess. Dr. Garcia–Cantu drained the abscess, repaired Casas's colon, and inserted a Jackson–Pratt drain to prevent further problems. Following the surgery, Dr. Garcia–Cantu continued the Maxipime and Flagyl prescriptions, and a culture of the removed abscess revealed an E. coli infection, which is effectively treated with Maxipime. Casas received Maxipime and Flagyl for another five days, but hospital staff inadvertently failed to place a prescription renewal form on Casas's chart, resulting in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication. Even so, Casas

never tested positive for E. coli again and a culture of the incision site on July 18 instead grew Candida (a fungus) for which Diflucan (an antifungal) was prescribed. Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed.[4] Neither Maxipime nor Flagyl would have treated the Candida or coagulase-negative staph infection.

On July 23, Dr. Garcia–Cantu noted an abscess in the wound, which he drained by removing the staples and opening the wound. The next day, records indicate that a foul smell was emanating from the wound site, and hospital staff brought fans into the room to dissipate the odor. When Dr. Jelinek learned of the lapsed prescription on July 23, he informed Casas and then prescribed different antibiotics, Levaquin and Vancomycin. On July 25, after a CAT scan showed no abscess, Dr. Garcia–Cantu removed the drain. Casas left the Hospital on August 23, but she returned in early September and died two months later.

In May 2003, several members of Casas's family, including her husband and son, filed suit against the Hospital, Dr. Garcia–Cantu, and Dr. Jelinek. The plaintiffs claimed that the defendants' negligence caused Eloisa Casas to "suffer grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree or extent if properly diagnosed, treated and cared for." The plaintiffs sought to recover damages for Casas's injuries and mental anguish. They twice amended their petition, ultimately leaving the Casases as the sole plaintiffs.

4. There was a several-day lag between taking the culture and ordering the prescription, presumably to allow the culture to grow and to transmit the results to the treating physicians. Thus, the Diflucan was prescribed on July 21 and the Vancomycin on July 23.

As required by former article 4590i § 13.01 of the Medical Liability and Insurance Improvement Act, *see* TEX.REV.CIV. STAT. art. 4590i § 13.01,[5] the Casases filed an expert report within 180 days of filing the original petition. In the report, Dr. John Daller opined that Dr. Garcia–Cantu and Dr. Jelinek were negligent in failing to discover that the antibiotics were not being given to Casas and that within "reasonable medical probability" this negligence resulted in a prolonged hospital stay and increased pain and suffering. Dr. Jelinek later filed a motion for sanctions and dismissal under article 4590i § 13.01(e), alleging that the expert report was deficient because, among other things, it failed to explain any causal connection between the negligence and the purported injury. The trial court denied the motion. Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia–Cantu.

At trial, Dr. Daller testified as the Casases' medical expert. During direct examination, he analyzed the Hospital's daily patient notes regarding Casas and identified the significant events. He noted changes in Casas's vital signs on July 21 and 22, such as increased heart rate and temperature, inflammation, and tenderness of the surgery site. Dr. Daller stated that "in medical probability" there was an infection in the abdomen, but on cross-examination he admitted that "there was no objective evidence present to demonstrate that intra-abdominal infection." When reviewing the patient notes for July 24, which noted the presence of a foul smell, he suggested that the smell was consistent with an anaerobic infection that would be difficult to culture because anaerobic bacteria die when exposed to air. Dr. Carl Berkowitz, the Hospital's expert, offered several other explanations for the smell, such as the Candida infection or dying tissue.

The Casases also called Casas's relatives to testify about her condition. Consistent with Dr. Daller's testimony, Casas's son linked the smell with the opening of the wound to drain the abscess: "The odor that I noticed was after they had taken out the staples on her incision, and one day that I went to see her as soon as they opened the door the whiff of this putrid smell just engulfed me." He also testified that Casas was upset upon learning that she had not received the antibiotics but was even more upset when the incision had to be opened and drained: "Well, after she was told and I was told that she wasn't getting antibiotics, like I said, she was upset. What really upset her more was when they had to—they had to take out the staples out of her incision, and they had to open her incision up again." Casas's husband testified that, while she was upset and did not trust the nurses or doctors after learning of the lapsed prescription, "she was still fighting. She ... wanted to beat this cancer she had." The son testified that Casas did not lose hope until she witnessed the events of September 11, 2001, following her re-admission to the Hospital: "That's why I remember that day so vividly in my mind because that was the turning point in my mom. She seemed to just give up, not fight, not want to fight anymore like she used to. And that was a very, very sad day."

5. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Former article 4590i § 13.01 was replaced by Texas Civil Practice and Remedies Code § 74.351, as amended.

The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia–Cantu proximately caused Casas's injury. The jury apportioned ninety percent of the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia–Cantu. It awarded $250,000 in damages to the Casases as compensation for Casas's pain and mental anguish.

The Hospital appealed, arguing that the evidence was legally and factually insufficient to prove causation or damages for mental anguish. Dr. Jelinek also appealed, challenging the trial court's denial of his motion for sanctions and dismissal. The court of appeals affirmed on all issues. —— S.W.3d ——.

## II. Analysis

We address in turn the two issues raised in this appeal: the legal sufficiency of the causation evidence and the sufficiency of the Casases' expert report.

### A. Sufficiency of the Evidence

The facts of this case are unfortunate: a woman with advanced colon cancer underwent surgery to repair her cancer-perforated and infected colon, and in the course of treatment for her many symptoms the Hospital failed to renew her antibiotic prescriptions for a four-and-a-half-day period. The Hospital admits it should have continued the antibiotics. Even so, the plaintiff bears the burden to prove that the negligence caused an injury: "[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex.1984). Only the second nexus is at issue here.

In *City of Keller v. Wilson*, we considered at length the parameters of legal sufficiency review, quoting with approval Chief Justice Calvert's seminal article on the topic:

"No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

168 S.W.3d 802, 810 (Tex.2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L.REV. 361, 362–63 (1960)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). The same is true when the evidence equally supports two alternatives: " 'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller*, 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex.1991)). When considering such cases, "we must 'view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances,' " *id.* at 813–14 (quoting *Lozano v. Lozano*, 52 S.W.3d 141, 167 (Tex.2001) (per curiam)), and we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814.

To meet the legal sufficiency standard in medical malpractice cases "plaintiffs are required to adduce evidence of a

'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex.1993) (citations omitted). Thus, we examine the record to determine if the Casases presented legally sufficient evidence that "in reasonable medical probability" the Hospital's negligence caused Casas additional pain and suffering.

When distilled to its essence, the Casases' claim is predicated on the presence of an infection—treatable by the lapsed antibiotics—that caused Casas pain and mental anguish above and beyond that caused by the cancer, the surgery, and the other known infections. The absence of an infection treatable by Maxipime and Flagyl would undermine the Casases' claim, for then the prescription lapse would amount to an unfortunate, but harmless, occurrence. The Hospital argues that the Casases presented no evidence that the Hospital's negligence caused such an infection. The Casases' expert admitted there is no direct evidence of an anaerobic infection, leaving the jury to consider the circumstantial evidence and make proper inferences from it. In reviewing the record, we initially decide if jurors can determine causation under these facts unaided by expert testimony—that is, whether lay testimony regarding causation is legally sufficient.

### 1. Lay Testimony of Causation

■ Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller*, 168 S.W.3d at 812. In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex.2007); *see also Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."). We have allowed lay evidence to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Morgan*, 675 S.W.2d at 733 (citing *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970)). Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation. As we noted in *Guevara*, "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation." 247 S.W.3d at 668.

■ When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. In *Morgan*, for example, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred

vision, headaches, and swelling of the breathing passages. 675 S.W.2d at 733. In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id.* Likewise in *Guevara*, we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id.* at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668.

The present case does not fall within this rule. Unlike in *Morgan*, an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when the plaintiff's symptoms were reasonably attributable to the negligence and to nothing else. Rather, a patient with terminal colon cancer did not receive antibiotics for four-and-a-half days following major abdominal surgery and after having received the medications for eight days. There is no direct evidence that she suffered from an infection treatable by the omitted antibiotics, but there is evidence that she had two other infections that accounted for all of her symptoms during that time. Given Casas's medical condition, expert testimony was crucial to link the prescription lapse to an infection causing additional pain and suffering beyond what she would otherwise have experienced. *See Kaster v. Woodson*, 123 S.W.2d 981, 983 (Tex.Civ. App.-Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *see also Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex.1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.").

The Casases point to testimony by Casas's husband and son to support their argument that she deteriorated rapidly after discovering she did not receive the antibiotics. But this characterization overstates the evidence. While Casas's husband testified she was upset and did not trust her doctors following the discovery, she was still determined to fight her cancer. The son also observed Casas's anger and lack of trust but testified that the opening of her wound, which occurred the same day she learned of the lapse, upset her even more. As Dr. Daller admitted, Candida likely caused the abscess that required Dr. Garcia–Cantu to drain the wound. Further, based on his experience at Casas's bedside, her son pinpointed the tragic events of September 11, 2001, and their effect on his mother as the turning point in her mental state. The latter event was some seven weeks after discovery of the lapsed prescriptions and after Casas's discharge from and re-admission to the Hospital. This evidence does not bear out the Casases' claim of a marked shift in Casas's mental resilience following the omission of the medications.

More importantly, Casas's husband and son were unable to precisely identify the cause of her suffering. While they could accurately describe her discomfort, they were unable to say if it was the cancer, the surgery, the other infections, or the lapse that caused it. Even testimony that Casas suffered after learning of the omission raises no more than a mere suspicion of causation, and that is not enough, see *Guevara*, 247 S.W.3d at 668, particularly in light of the evidence that Casas thought she was cured of cancer before the surgery and then learned that not only was it "back with a vengeance," it was terminal. The testimony of Casas's husband and son is evidence of her suffering, but not of its cause. Thus, we hold that the lay testimony presented by the Casases is legally insufficient to establish that the Hospital's negligence caused Casas additional pain and suffering.

## 2. Expert Testimony

■ The Casases also presented expert testimony regarding causation. The Casases' expert, Dr. Daller, testified that the Hospital's negligence "in medical probability" caused Casas additional pain and suffering. He based this opinion on the presence of an intra-abdominal infection that could have been treated using Maxipime and Flagyl. Admitting that no direct evidence indicated such an infection, Dr. Daller pointed to various circumstantial indicators that suggested an infection. These indicators were primarily Casas's changed vital signs, such as fever and in-

creased heart rate: "Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her heart rate went up, to me that suggests the presence of on going [sic] infection." [6] But on cross-examination, he conceded these data were equally consistent with two other infections cultured from Casas's incision and blood—Candida and coagulase—negative staph—neither of which is treatable by Maxipime or Flagyl:

Q. Now, Candida, infection of a wound like this, they can cause high temperatures. Correct?

A. Fungal infections can cause a high temperature, yes.

Q. It can cause increased heart rate?

A. That is correct.

Q. And inflammation?

A. That is correct.

Q. Pain?

A. That is correct.

Q. How about an abscess?

A. It caused or is part of the abscess in that wound that was present, that wound infection that needed to be opened.

Q. So when Doctor Garcia went in on 7/23 ... and drained that wound at bedside that abscess was within a reasonable degree of medical probability caused by the Candida?

6. When asked if the lapsed prescriptions affected Casas's hospital stay, Dr. Daller equivocated:

A. I think that it certainly did impact it. However, I cannot quantitate that because there are multiple variables that are present in a clinical condition. Whether it lengthened her stay by one day, two days, three days, I cannot say that. What I would say from a scientific standpoint is that for four

and a half days she did not receive appropriate therapy. Had she received the appropriate therapy then *you would expect* her length of stay to be shortened somewhat. To quantitate that, I could not do that.
. . . .
A. Obviously, not receiving antibiotics is not going to shorten your stay. Therefore, *if it impacted the stay* it must have lengthened it. (emphases added).

A. That was one of the organisms that was there. It was the organism that was cultured. That is correct.

. . . .

Q. . . . This coagulase negative staph causes fever?

A. Correct.

Q. Increased heart rate?

A. The fever will cause increased heart rate.

. . . .

Q. It can cause pain?

A. Depending upon the site. Correct.

Q. Okay. All of these things can be caused by coagulase negative staph and Candida, which we know were present 7/18 through 7/23, the time period she did not get antibiotics?

A. That's correct.

Q. Neither one would have been killed by Maxipime or Flagyl?

A. That's correct.

It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.'" *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex. 1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ("Conclusory or speculative opinion testimony is not relevant evidence because it does not

tend to make the existence of material facts more probable or less probable."). When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger,* 455 S.W.2d at 707 ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart,* 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

By conceding that Casas's symptoms were consistent with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his conclusion that an undetected infection was also present. While it is possible that Casas did have such an infection, its presence can only be inferred from facts that are equally consistent with the Candida and coagulase-negative staph infections. "'When the circumstances are

equally consistent with either of two facts, neither fact may be inferred.'" *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite,* 819 S.W.2d at 805). Here, objective data—the cultures—support the Candida and staph infections but not the supposed anaerobic infection.[7]

■■■■■ Based on the record evidence, an anaerobic infection cannot be proved or disproved. It is equally plausible that Casas had such an infection or that she did not. Dr. Daller opined that she did, but he did not explain why that opinion was superior to the opposite view. Such evidence raises no more than a possibility of causation, which is insufficient. As we said in *Bowles v. Bourdon,* "'[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.'" 219 S.W.2d at 785 (quoting *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492, 498–99 (1928)).

The Casases argue that the foul smell, which is consistent with an anaerobic infection, is strong evidence of such an infection. Looking at the patient notes for July 24, Dr. Daller commented on the smell:

A. The text says something about drainage to the abdomen with moderate amount of drainage. And it says that it is foul smelling.

. . . .

Q. The [previous notes] that I remember that we have gone over didn't say anything about foul smelling?

A. That's correct. They were just described as I recall as being purulent and looking like puss [sic].

Q. What does that mean when it says "foul smelling"?

A. When you have foul smelling, it suggests that the organism is an anaerobe. In other words, one of those bacteria that didn't need oxygen in order to grow that, for example, Flagyl would treat.

Q. Okay. Does that give you clinical evidence that had she been continued on Maxipime and Flagyl that they would have had some effect with regards to the condition as we see it on the 24th?

A. Well, like I said, most anaerobes are sensitive or susceptible to Flagyl. And she had previously been on Flagyl and at this time she is not. So I would have expected that that would be an appropriate antibiotic that would have covered the organism that's causing that foul smell.

Dr. Berkowitz, the Hospital's expert, offered several other explanations for the smell, including necrotic tissue, dead cancer tissue, and the Candida infection.[8] As

---

7. Admittedly, anaerobic bacteria are hard to culture because they are averse to oxygen.

8. Dr. Berkowitz testified:

I think that there are a number of things that can cause things smelling bad besides just infection. Tissue that dies doesn't smell good. There's bacteria and products released by the dead tissue that don't smell good.

And we know based on the pathology report of the cancer that they took out of her abdomen, that this had grown enough that it was dying. In other words, it was probably outgrowing it's [sic] blood supply and was starting to die. That in and of itself can smell bad. Then you have a wound that is infected; although Candida itself does not typically smell bad, not like something dead. It smells funky and peo-

noted, Casas's son noticed the smell after the incision was opened to drain the abscess, which Dr. Daller admitted was likely caused by Candida.

 Here again, there are competing explanations for the smell, which amounts to no more than circumstantial evidence of some kind of infection or possibly dying tissue. Because there is no direct evidence of the infection and the circumstantial evidence is meager, we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *City of Keller*, 168 S.W.3d at 814. Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings when those findings are not supported by credible evidence. When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. The evidence in this case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying tissue, cancerous or otherwise—did not provide the jury a reasoned basis from which to infer the presence of a negligence—induced infection. Because the jury could not reasonably infer an infection caused by the Hospital's negligence, we agree with the Hospital that no evidence supports the jury's verdict.

We understand the Casas family's predicament and frustration at the Hospital's conduct, and we recognize the difficulty of proving that the lapsed prescriptions caused a painful infection. But the Casases shouldered that burden and must prove the causal link with reasonable certainty. In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic infection is medically more probable than one based on the known infections and the dying tissue, leaving the jury to guess if the lapsed prescriptions caused additional pain and suffering. Without probative medical testimony that the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than the cancer, the surgery, and the other infections already inflicted, there is no legally sufficient evidence of causation. Dr. Daller did not provide that causal link; accordingly, we hold that his testimony is legally insufficient to support the jury's verdict. Because the Casases failed to prove causation, we reverse the judgment of the court of appeals and render judgment that the Casases take nothing.

## B. Adequacy of the Expert Report

 In his petition, Dr. Jelinek raises a single issue: whether the trial court abused its discretion by denying his motion for sanctions and dismissal because the Casases' expert report was deficient under former article 4590i § 13.01, the statute in effect at the time. *See* Tex.Rev. Civ. Stat. art. 4590i § 13.01. Article 4590i required the report to provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that

---

ple don't like the way it smells. The wound itself when it wasn't healing was probably having some necrotic tissue, as well, or dead tissue that is in the wound. I'm sure that smelled bad, as well. And they were never able to completely get rid of all that

dead cancer tissue that was in her abdomen.

I think there's a number of reasons why she would have had a bad smell, none of which can be explained by four or five days of not getting Flagyl [or] Maxipime.

failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). "If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section.'" *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (per curiam) (quoting § 13.01(*l*)). Dismissal for failure to serve an adequate expert report also carried mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001) (citing § 13.01(e)).

We have defined a "good-faith effort" as one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). All information needed for this inquiry is found within the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* Importantly for this case, the "report cannot merely state the expert's conclusions about these elements," but "'the expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort. *Palacios,* 46 S.W.3d at 879.

We review the trial court's grant or denial of a motion for sanctions and dismissal under the abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 877–78. A district court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Wright,* 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

Dr. Jelinek argues that the Casases' report is deficient in two ways, failing (1) to state the applicable standard of care, and (2) to provide more than conclusory statements of causation. We focus on the latter. Dr. Daller's report concluded that Dr. Jelinek's breach of the appropriate standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." Aside from repeating essentially the same phrase twice more, the report says nothing more regarding causation. The Casases argue this statement is sufficient to meet the good-faith requirement. We disagree.

An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second *Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. *See* 46 S.W.3d at 879. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized. *See Pollock,* 284 S.W.3d at 818 (citing *Burrow,* 997 S.W.2d at 235); *Earle,* 998 S.W.2d at 890 ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Instead, the expert must go further and explain, to a reasonable de-

gree, how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate. *See Wright,* 79 S.W.3d at 53.

Under these standards, the Casases' report is conclusory on causation. It offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach

caused the injury. Again, the plaintiff need not marshal all of his proof in the report, but he must include sufficient detail to allow the trial court to determine if the claim has merit. Because the Casases' report lacks any explanation linking the expert's conclusion to the relevant facts, we hold that the trial court abused its discretion by denying Dr. Jelinek's motion and the court of appeals erred by affirming that ruling.[9] *See id.* at 52. Accordingly, we remand the case to the trial court for an award of attorney's fees and costs[10] under former article 4590i § 13.01(e) against the Casases and their counsel.[11]

---

**9.** In his dissent, CHIEF JUSTICE JEFFERSON argues that an expert report need not meet the legal sufficiency requirements necessary to support a judgment and suggests that we hold it must. We agree that an expert report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. But, as we stated earlier, the report must provide more than conclusory statements concerning applicable standards of care, breach of those standards, and causation. *See id.* An expert report must instead, within its four corners, provide some explanation as to each of these elements. TEX.REV. CIV. STAT. art. 4590i § 13.01(r)(6); *Wright,* 79 S.W.3d at 52. The report here offered only a conclusory statement concerning causation with no explanation as to how the lapse in antibiotic treatment resulted in longer hospitalization, increased pain and suffering, or ultimately Casas's death.

**10.** In her dissent, JUSTICE LEHRMANN indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference, and (2) Dr. Jelinek should not be entitled to attorney's fees and costs if the Casases can make this showing and submit an adequate report. We note that the Casases did not request a remand of this nature, nor brief the attorney's fees issue. *See State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008) (observing that "[a] party generally is not entitled to relief it does not seek" and refusing to sua sponte grant relief that was not sought); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410

(Tex.1997) (noting that ordinarily, failure to brief an argument waives error on appeal); TEX.R.APP. P. 38.1(h).

**11.** We briefly note that under former article 4590i a trial court's order denying a motion to dismiss premised on an inadequate expert report was not immediately appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 and 74.351. Nor did we definitively say that mandamus review was appropriate for such orders until almost four years after the trial court denied Dr. Jelinek's motion for dismissal and sanctions. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–62 (Tex.2008). Thus, we do not fault Dr. Jelinek for waiting until final judgment to seek review of the trial court's order. *See Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ("Generally, appeals may only be taken from final judgments...").

We mention this point because we have since cautioned that a defendant—having foregone the interlocutory appeal now available—risks losing the right to appeal following final judgment if, after a trial on the merits, the jury finds the defendant liable. *See id.* at 321. Even if the present statute applied here, this caution would not bar Dr. Jelinek's appeal because he was not a party at trial, having been nonsuited earlier. We will not bar a nonsuited defendant's appeal after final judgment because the jury finds him liable at a former codefendant's trial. Such a defendant did not call or cross-examine witnesses, present evidence, or otherwise participate at trial and should not be bound by what happens there.

## III. Conclusion

For the foregoing reasons, we reverse the court of appeals' judgment, render judgment that the Casases take nothing, and remand to the trial court for an award of Dr. Jelinek's attorney's fees and costs consistent with this opinion.

Chief Justice JEFFERSON filed an opinion, dissenting in part, in which Justice GREEN and Justice LEHRMANN joined.

Justice LEHRMANN filed an opinion, dissenting in part.

Chief Justice JEFFERSON, joined by Justice GREEN and Justice LEHRMANN, dissenting in part.

We must decide whether an expert report gave a "fair summary" of the expert's opinions regarding standard of care, failure to meet the standard, and the link between that failure and the patient's damages. We must consider the expert's opinions "as of the date of the report." TEX. REV.CIV. STAT. art. 4590i § 13.01(r)(6) (repealed 2003). To do so, we must disregard today's holding that, at trial, there was no evidence linking the discontinuation of antibiotics to increased suffering by Casas. The expert report submitted in this case gave fair notice of a meritorious claim— that the doctor failed to ensure that his patient received antibiotics, thereby increasing her pain and suffering. I would affirm the court of appeals' judgment with respect to the doctor.

## I. Background

Eloisa Casas, a patient recently diagnosed with colon cancer, was admitted to Rio Grande Hospital for abdominal pain. The cancer had perforated her colon, the contents of which leaked into her abdominal cavity, causing an abscess. After the doctor drained and surgically removed the abscess, he discovered that Casas had an E. coli infection, for which the doctor prescribed two antibiotics. Although those prescriptions were supposed to have been renewed five days later, they lapsed. Casas contends this mistake occurred because the doctor failed to ensure that hospital staff complied with his renewal order. During the four days after the prescriptions expired, Casas's surgical incision began to emit a putrid odor. She developed several infections in addition to E. coli, exacerbating her pain and extending her stay in the hospital. Casas died two months after she was discharged.

Casas's estate sued the Hospital and two of the treating doctors, Dr. Garcia–Cantu and Dr. Jelinek, for negligently causing Mrs. Casas "grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree if properly diagnosed, treated and cared for...." The trial court denied Dr. Jelinek's motion to dismiss the case against him. Nevertheless, the estate nonsuited both doctors more than a year before Casas's claim against the Hospital was tried to a jury. At that trial, the jury found the hospital 90% negligent, and each doctor 5% negligent. The trial court rendered judgment against the hospital, and the court's order non-suiting Dr. Jelinek "with prejudice" merged into that final judgment.

Dr. Jelinek and the hospital appealed the trial court's judgment. The hospital complained that the evidence was legally insufficient to support the verdict. Dr. Jelinek complained that the trial court improperly denied him attorney's fees, as the expert report was not a good faith effort to comply with statutory requirements. The court of appeals affirmed, 2008 WL 2894889, *9–*10, 2008 Tex.App. LEXIS 5647, *28–*29 (Tex.App.-Corpus Christi July 29, 2008), and the appellants below are now petitioners here. I fully join the

Court's rendition of judgment for the hospital. I disagree with the Court's holding as to the doctor.

## II. Good faith effort; fair summary

Former article 4590i provided that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [the statute]." TEX.REV. CIV. STAT. art. 4590i § 13.01(*l*). "That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (citing TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6)). Because an expert report is filed long before discovery is complete, we cannot judge it according to what subsequent discovery reveals or how the evidence develops at trial. The question is whether the report fairly summarizes the malpractice elements before the case is tested in a full adversary process. For that reason, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

The report must also give the defendant notice of the conduct the plaintiff challenges, and the trial court must have a basis to determine whether the claim has merit. *Id.* The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved the issue, but instead whether the trial court abused its discretion. *See, e.g., Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

## III. Dr. Daller's report

Dr. Daller is a physician and an expert on intra-abdominal abscesses and infection. His report states that a doctor treating a patient like Casas must ensure that the antibiotics he prescribes are actually administered. Despite that standard, Dr. Daller states that antibiotics prescribed for Ms. Casas were not administered from July 17 through July 23, even though "[t]here [wa]s no order to discontinue the antibiotic therapy." He concluded that Dr. Jelinek breached the standard of care by his "failure to recognize that the antibiotics were not being administered as ordered." Dr. Daller concludes that "[t]his breach in the standard of care . . ., within reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering. . . ."

## IV. Dr. Daller gave a "fair summary" of the required standard of care and how the allegedly inadequate care fell below that standard.

The Court concludes that Dr. Daller's report lacks the detail necessary to conclude that the estate's lawsuit has merit. But the cases it cites as support involve situations in which a hindsight view is entirely appropriate. *Earle v. Ratliff,* for example, is a summary judgment case; it presents the higher evidentiary standard that *Palacios* rejected for expert reports. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999) ("Summary judgment can be granted on the affidavit of an interested expert

witness, ... but the affidavit must not be conclusory.... [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."). Similarly, the standard employed in *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817–18 (Tex.2009), also cited by the Court, is inapplicable here, since it examined an expert report under the "no evidence" standard of review. *See* —— S.W.3d at ——.

In *Palacios* we held that an expert report that failed to articulate a standard of care or explain how the defendant hospital breached that standard was not a good faith effort to comply with the statutory requirements. *Palacios*, 46 S.W.3d at 880. The expert in that case blamed the hospital for taking no action to prevent a patient from falling out of his bed, even though the patient "had a habit of trying to undo his restraints." *Id.* at 879–880. The report, as such, was not a fair summary of the evidence because it neglected to articulate what actions the hospital *should* have taken that it did not. *Id.* at 880. Thus, the trial court did not abuse its discretion by dismissing the plaintiff's claim for lack of a good faith effort to summarize the expert's opinions.

Subsequently, in *Bowie Memorial Hospital v. Wright*, we held that the trial court did not abuse its discretion in concluding that an expert report failed to comply with the statute, as the report did not "establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to [the patient's] injuries." *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51–53 (Tex.2002) (quoting the expert in that case as speculating, "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome."). We observed that a report must

satisfy *Palacios*'s two-part test. *Id.* at 52. Because the report "lack[ed] information linking the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.* at 53.

In each of those cases, the trial court could not have evaluated the claim's merit without speculating about actions the defendant could have taken to prevent injury. No such speculation is required here. Dr. Daller states that had the antibiotics been administered from July 17 through July 23, Eloisa Casas would have suffered less. Dr. Daller could have stated that conclusion in greater detail, of course, but "[a] report need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878. Daller's report includes his opinions on (1) the applicable standard of care (to maintain vigilance over a patient's treatment), (2) the manner in which the care failed to meet that standard (failing to ensure the treatment he ordered was actually administered), and (3) the causal connection between the failure and the claimed injury (without the antibiotics, the patient's pain and suffering increased and she required additional hospitalization).

A "good faith effort" does not require that the report "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"; therefore, an expert report does not fail the good faith effort test merely because it may not later prove legally sufficient to support a judgment. *Id.* at 879. So, here, whether the Casas estate ultimately amassed sufficient proof in an adversarial trial is beside the point; the claim itself was far from frivolous. *See id.* at 878 (noting that "one purpose of the expert-report requirement is to deter frivolous

claims"). The law imposes a penalty for filing a frivolous suit. Only by today's decree does it also punish a claimant for failing to win an arguably meritorious case. *Cf. TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (1991) (holding that "sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the . . . process justifies a presumption that its claims or defenses lack merit.").

I agree with the Court that the Estate failed to prove causation at trial; I disagree that, as to Dr. Jelinek, the expert report was not a good faith attempt to comply with the statute. I respectfully dissent in part from the Court's judgment.

Justice LEHRMANN, dissenting in part.

I fully join Chief Justice Jefferson's dissent. I write separately, however, to highlight the incongruity inherent in the Court's decision to remand the case for an award of attorney's fees and costs under former article 4590i § 13.01(e), given this case's circumstances. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01(e) (repealed 2003)[1] . The Court presumes that Dr. Michael Jelinek is entitled to attorney's fees because the expert report filed by Eloisa Casas's estate[2] was, on appeal, determined to be insufficient. But, after a pre-trial hearing was held on the defendant's motion to dismiss the lawsuit, the trial court rejected Dr. Jelinek's contention that the report was inadequate; consequently, the Casases had no opportunity to rectify any

deficiencies as the statute and our precedent would have allowed.

Section 13.01(e) of article 4590i provided for an order awarding attorney's fees and costs if a health care claimant failed to supply an expert report within the time required under subsection (d)—180 days. But the statute provided several avenues for health care claimants to obtain an extension of the 180-day deadline, including section 13.01(g). That provision required the trial court to grant a thirty-day extension of the statutory deadline if a claimant's failure to provide an expert report was not intentional or the result of conscious indifference. And we have expressly held that "a party who files a timely but inadequate expert report may seek relief under the grace period provisions of section 13.01(g)." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). Thus, health care claimants could receive an opportunity to rectify deficiencies in a report if they could show that they did not intentionally, or with conscious indifference, submit an inadequate report.

Here, the Casases never had the chance to request an opportunity to cure any deficiencies in their report because the trial court determined that the report adequately complied with section 13.01(d). In *Gutierrez,* we were guided by our recognition that it would be "perverse" to allow a claimant who filed no report a second chance to comply with the statute's expert report requirement, while "punishing those who attempt to comply with the statute but fail." *Id.* In this case, perversely, the Casases may have been in a better position

---

1. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003

Tex. Gen. Laws 847, 884. For ease of reference, I will refer to the relevant provisions as they were identified in article 4590i.

2. I refer to the estate, which was represented by Casas's husband and son, as "the Casases."

than they are now if the trial court had found that the report was inadequate; they might have had an opportunity to eliminate any deficiencies.

I agree fully with Chief Justice Jefferson that the report represents a good-faith effort to comply with section 13.01. Even if it did not, however, I would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference. *See City of DeSoto v. White,* 288 S.W.3d 389, 401 (Tex.2009) (remanding in the interest of justice *sua sponte* to allow police officer "to make an appellate election with full knowledge of his appellate rights and with knowledge of" the guidance provided in Court's opinion). In my view, the Casases should not be assessed attorney's fees and costs if they can make the showing section 13.01(g) requires and then submit a report complying with the statute. For these reasons, as well as those expressed by Chief Justice Jefferson, I respectfully dissent in part.