

# NUMBER 13-17-00097-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

AHMAD KARKOUTLY, M.D.,                                                    Appellant,

v.

MARIA GUERRERO, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF MARIA OTILIA ESTRADA,                           Appellee.

### On appeal from the 138th District Court
### of Cameron County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Longoria
### Memorandum Opinion by Justice Rodriguez

In this interlocutory appeal, appellant Ahmad Karkoutly, M.D. challenges the denial

of his motion to dismiss the health care liability claim of appellee Maria Guerrero. We

reverse and remand.

## I.  BACKGROUND

Guerrero filed suit for medical negligence against two hospital entities and nine physicians, including Dr. Karkoutly.   Guerrero's petition alleged that on October 9, 2013, her mother Maria Otilia Estrada was admitted to Valley Regional Medical Center, a hospital in Brownsville, Texas.   She complained of abdominal pain, nausea, and vomiting, and had a history of colon ailments.   Various defendants treated her for several weeks, including multiple surgeries.   However, Estrada died, allegedly because the defendants' substandard care caused Estrada to suffer septic shock and respiratory failure.

To support her claim against Dr. Karkoutly, Guerrero filed an expert report authored by David H. Miller, M.D.   Guerrero did not file expert reports concerning any other defendant, and Dr. Karkoutly became the only defendant remaining in the case.

Dr. Karkoutly filed a motion to dismiss Guerrero's claims, asserting that Dr. Miller's report did not satisfy the requirements of the Texas Medical Liability Act (TMLA).   *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West, Westlaw through 2017 1st C.S.).   Dr. Karkoutly objected to multiple aspects of Dr. Miller's report, including the objection that is the subject of this appeal:   conclusory statements and logical inconsistencies in Dr. Miller's opinions on causation.   Following a hearing, the trial court denied Dr. Karkoutly's motion to dismiss.   This interlocutory appeal followed.

## II.  CAUSATION

By his sole issue on appeal, Dr. Karkoutly contends that Dr. Miller's report is fatally inadequate under the TMLA.   In particular, Dr. Karkoutly asserts that the report inadequately addresses the causation element of Guerrero's health care liability claim,

offering only a conclusory and internally inconsistent account of how Dr. Karkoutly's acts and omissions caused Estrada's demise.

## A.      Dr. Miller's Report

Dr. Miller began his report by summarizing Estrada's medical records. According to Dr. Miller's report, Estrada presented to the hospital with a history of diverticulitis—a condition of the colon—along with chronic "hypovolemia," nausea, and vomiting. Estrada's initial screening revealed apparent signs of infection to the point of sepsis, which included an elevated heart rate, respiratory rate, and white blood cell count. Dr. Miller explained that upon her admission to the hospital, Estrada met the criteria for systemic inflammatory response syndrome or "SIRS," which meant that she was already septic or in danger of developing severe sepsis.

Estrada was diagnosed with a likely "stricture" in her colon, and on October 15, 2013, she underwent surgery to remove a portion of her colon, with an "ileostomy" (which Dr. Miller described as draining the colon using a tube) and "anastomosis" (which he described as reconnection of the remaining colon). Following her surgery, Estrada was admitted to the intensive care unit under the care of Dr. Karkoutly, who diagnosed her with SIRS. Dr. Karkoutly treated her with antibiotics and noted her continuing signs of sepsis, which worsened in the following days.

As we read his report, Dr. Miller discussed three potential causes of Estrada's infection. In his opinion, the two "likely" causes of her infection were a rupture of the colon or the failure of the surgical reconnection of her colon following her initial operation. Another "possibl[e]" cause was the perforation of her colon during her pre-operative colonoscopy. Out of these three, Dr. Miller felt that it was "fairly clear from Dr. Karkoutly's

3

daily charting that something" had gone wrong with the surgical reconnection of the colon—i.e., that the reconnection had failed and was leaking fecal matter into the surrounding tissue, causing infection. Beyond his statement that the source was "fairly clear" from Dr. Karkoutly's chart notations, Dr. Miller offered no further explanation of his reasoning concerning the source of the infection.

Dr. Miller asserted that as Estrada's condition deteriorated, with high fevers and severe respiratory distress which required intubation, the only way to save such a patient would be to perform exploratory surgery to find and correct the source of the infection. According to Dr. Miller, exploratory surgery should be performed within "the first few days" after the damage to the colon in order to maximize the patient's chance of survival and to satisfy the standard of care. However, Estrada did not undergo exploratory surgery until "around ten days" after her first operation. Dr. Miller asserted that Dr. Karkoutly was negligent in failing to recommend the surgery sooner (it was undisputed that Dr. Karkoutly did not perform the exploratory surgery himself). Dr. Miller did not mention any new information that was gleaned from the exploratory surgery, or whether the exploratory surgery yielded any progress toward resolving Estrada's condition.

Nonetheless, as to causation, Dr. Miller theorized that if Dr. Karkoutly had promptly arranged for the exploratory surgery within a few days of Estrada's initial operation, the surgery would have led to the discovery and correction of the source of sepsis. Dr. Miller viewed this delay as critical, because the compromise or perforation of the large intestine, if left untreated, may develop into sepsis over time. Dr. Miller explained that if the compromise of the intestine is treated early on, mortality rates remain low, but "as the

4

patient approaches 48 hours post-injury without surgical correction, mortality rates are about 40% or higher," according to medical literature. Therefore, according to Dr. Miller, Dr. Karkoutly's delay in recommending exploratory surgery caused Estrada's condition to develop into septic shock and eventually led to her death.

Upon review of Dr. Miller's report, the trial court determined that the report satisfied the requirements of the TMLA, and the court denied the motion to dismiss.

## B.    Standard of Review and Applicable Law

We apply the abuse of discretion standard in reviewing the trial court's decision on a motion to dismiss under the TMLA.   *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). Under that standard, we defer to the trial court's factual determinations if they are supported by evidence, but we review its legal determinations de novo.   *Van Ness*, 461 S.W.3d at 142.

"Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.   TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).   A court shall grant the motion to dismiss "*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report . . . ." *Jelinek*, 328 S.W.3d at 539 (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51–52 (Tex. 2002) (per curiam)) (emphasis in original); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*).

5

A "good-faith effort" is one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Jelinek*, 328 S.W.3d at 539. All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all the plaintiff's proof, but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* The report cannot merely state the expert's conclusions about these elements, but instead must explain the basis of the expert's statements to link his conclusions to the facts. *Id.*; *Bowie Mem'l*, 79 S.W.3d at 52.

As to causation, an "expert must explain, based on facts set out in the report, how and why" a health care provider's breach proximately caused the injury. *Columbia Valley Healthcare Sys., LP v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id.* at 460. An act or omission qualifies as the cause-in-fact of harm if, but for the act or omission, the harm would not have occurred. *Id.* A bare expert opinion that the breach caused the injury does not suffice as a "good faith effort." *Id.*

## C. Analysis

According to Dr. Karkoutly, the crux of Dr. Miller's theory of causation is that Dr. Karkoutly was negligent in delaying his recommendation of exploratory surgery until ten days after Estrada's initial operation on October 15. Dr. Miller opined that if Dr. Karkoutly had promptly recommended exploratory surgery within a few days after the initial operation, the source of the infection would have been timely discovered, and Estrada would not have experienced decline into sepsis and death. However, Dr. Karkoutly

6

argues that Dr. Miller's expert opinion on causation is conclusory because it does not link his conclusions with the facts. Instead, Dr. Miller's report simply states his conclusion on causation without elaboration, and it does so in a logically inconsistent manner, leaving "analytical gaps" between Dr. Karkoutly's alleged breach and his patient's harm. We agree.

We perceive at least two areas of concern in Dr. Miller's opinion on causation: first, deficiencies in his opinion regarding the physical problem that was the source of Estrada's infection; and second, deficiencies in his opinion regarding the exploratory surgery that, he supposed, would have discovered and corrected that source of infection.

First, Dr. Miller discussed three potential sources of infection: (1) a rupture of Estrada's colon, (2) a failure of the surgical reconnection of her colon after her initial operation, and (3) a perforation of her colon during her pre-operative colonoscopy. Dr. Miller felt that it was "clear from Dr. Karkoutly's daily charting" that the second possibility was to blame, and the surgical reconnection had failed. However, Dr. Miller did not offer any supporting facts, analysis, or explanation to justify this conclusion. Moreover, this opinion appears to conflict with Dr. Miller's own account of the sequence of events. As Dr. Miller effectively conceded, Estrada was already showing "signs of developing sepsis on admission" to the hospital; it is simply that her condition formally progressed into "septic shock shortly after the October 15, 2013 surgery." Nonetheless, Dr. Miller opined that the failure of the surgical reconnection was clearly the source of the sepsis.

The second and more important gap in Dr. Miller's report is his conclusory and inconsistent account of how Dr. Karkoutly's delay in recommending surgery caused harm

7

to Estrada. Dr. Miller asserted that Dr. Karkoutly should have promptly recommended exploratory surgery within "a few days" after Estrada's initial operation, but his delay instead allowed the source of the infection to persist as Estrada's condition worsened. According to Dr. Miller, an earlier exploratory surgery would have discovered the source of the infection—be it a rupture, a perforation, or a failure of the surgical reconnection— and led to its timely correction. However, Dr. Miller's opinion suffers from a glaring omission: ten days after Estrada's first operation, there *was* an exploratory surgery, and yet Dr. Miller's report did not mention whether the exploratory surgery actually led to any progress in isolating or resolving the source of the infection. Without disclosing the outcome of the exploratory surgery, Dr. Miller provides no basis to believe that the timing of the surgery would have made any difference to the patient's health.

Dr. Miller's omissions concerning the exploratory surgery are made even more conspicuous by other gaps in the report: even long after the exploratory surgery, Dr. Miller's report continued to discuss three "likely" or "possible" sources of infection, and he offered no factual basis to justify a choice among these three possibilities beyond his view of "Dr. Karkoutly's daily charting." Dr. Miller provided no clue as to what those charts might contain that led him to his belief, leaving only his *ipse dixit* as to their significance. And if, indeed, the surgeons were unsuccessful in performing exploratory surgery ten days after Estrada's initial operation—which we do not suppose—Dr. Miller gave no explanation why an exploratory surgery two days afterward would have been better able to determine the source of the infection.[1]

_____

[1] Again, we do not intend to fill the gaps in Dr. Miller's report with our own suppositions. Instead, we leave these gaps outstanding, and we simply note (1) the conspicuous absence of these facts, and (2)

8

It was Dr. Miller's obligation to explain, "based on facts set out in the report, how and why" Dr. Karkoutly's delay in recommending exploratory surgery proximately caused the injury. *See Columbia Valley*, 526 S.W.3d at 459–60. But we find nothing of substance in his report to explain how the delay was a cause-in-fact of Estrada's harm; Dr. Miller's report offers no reason, fixed in fact, to believe that but for Dr. Karkoutly's delay, the outcome would have been any different. *See id.* Rather, all the report offers is a "bare expert opinion that the breach caused the injury," and Dr. Miller's own description of the facts appears to conflict with his conclusory opinions. *See Columbia Valley*, 526 S.W.3d at 460; *Carreras v. Trevino*, 298 S.W.3d 721, 725 (Tex. App.—Corpus Christi 2009, no pet.) (concluding that where the factual content of a report contradicted the expert's assertions, and those assertions were otherwise conclusory, the report did not satisfy the TMLA); *Gray v. CHCA Bayshore LP*, 189 S.W.3d 855, 860 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that in light of an expert report's conclusory and often internally inconsistent opinions concerning breach and causation, the report did not satisfy the TMLA); *cf. Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *2–4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.) (finding that a report sufficiently addressed causation because it described, in detail, the harm caused by a physician's delay in ordering a surgery which successfully discovered and corrected

the ways in which these gaps give rise to serious questions about Dr. Miller's conclusions regarding causation. *Cf. Fulp v. Miller*, 286 S.W.3d 501, 509 (Tex. App.—Corpus Christi 2009, no pet.) (noting that we are precluded from *filling* gaps in an expert report by drawing inferences or guessing as to what the expert likely meant).

Furthermore, we do not intend to imply that each and every one of these absent details must be addressed in all similar cases in order to qualify as a good faith effort to explain causation. Rather, we discuss the details that are missing from Dr. Miller's report simply to illustrate the ways in which Dr. Miller might have adequately addressed causation.

a hole in the patient's gastrointestinal tract, where the report's factual content supported the expert's conclusion concerning the source of the infection).

We therefore cannot say that Dr. Miller's report satisfies the requirements of the TMLA. *See Columbia Valley*, 526 S.W.3d at 460. We hold that the trial court abused its discretion in denying Dr. Karkoutly's motion to dismiss Guerrero's health care liability claim. *See Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539.

However, it remains to be determined whether dismissal should be with prejudice. "The Act allows a trial court to grant one 30-day extension to cure a deficiency in an expert report, and a court must grant an extension if a report's deficiencies are curable." *Columbia Valley*, 526 S.W.3d at 461. While Dr. Miller's report does not advance a valid, factual explanation of causation, the deficiencies in his report are not so overwhelming that a valid explanation "would be impossible." *See id.* Accordingly, the "trial court here must be given the opportunity to consider an extension" or dismissal with prejudice, in its sound discretion. *See id.*

We sustain Dr. Karkoutly's sole issue on appeal.

### III. CONCLUSION

We reverse the ruling of the trial court and remand to the trial court for further proceedings consistent with this opinion.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 14th
day of December, 2017.