Affirmed and Memorandum Opinion filed February 15, 2011.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-00506-CV

___________________

 

Carlos Herrera, M.D., Appellant

 

V.

 

Javone Holiday, Individually and on Behalf of
the Estate of Aniyah Trenae Wright, Appellee



 



 

On
Appeal from the 127th District Court

Harris County,
Texas



Trial Court Cause No. 2009-67566

 



 

 

MEMORANDUM OPINION

This is an interlocutory appeal in a
healthcare-liability case governed by chapter 74 of the Texas Civil Practice
and Remedies Code.  Javone Holiday, individually and on behalf of her late
daughter, Aniyah Wright, sued Carlos Herrera, M.D., the Memorial Hermann
Hospital System, Memorial Hermann Sugar Land Hospital, and Memorial Hermann
Fort Bend Hospital (collectively “Memorial Hermann”) for alleged medical
malpractice.  Holiday served the defendants with an expert report prepared by
Douglas McIntyre, M.D.  Dr. Herrera moved to dismiss Holiday’s
healthcare-liability claim on the basis that Dr. McIntyre’s expert report
failed to satisfy statutory requirements as to causation.  The trial court
denied the motion and this interlocutory appeal followed.  Because we conclude the
trial court did not abuse its discretion in determining the report constitutes a
good-faith effort at compliance with statutory requirements, we affirm.  

I

            Javone Holiday first
visited Dr. Carlos Herrera in April of 2007 for prenatal care when she was
roughly three months pregnant, and continued to see Dr. Herrera throughout the
remainder of her pregnancy.  Holiday went into labor on October 21, 2007, and
was admitted to Memorial Hermann Sugar Land Hospital shortly before 6:00 p.m. 
Upon her arrival, nurses performed an initial vaginal examination and noted the
baby was in a cephalic, head-first position.  Shortly after 7:00 p.m. and
apparently again around 11:00 p.m., Holiday was given Cytotec, a labor-inducing
drug, on Dr. Herrera’s orders.  Around 2:10 a.m., Holiday reported she was
feeling pressure and a nurse observed “meconium on the sheet.”  The nurse then
performed a vaginal examination but was “unable to assess presenting part.”  Dr.
Herrera was paged at 2:20 a.m., and upon his arrival he assessed the baby was breech
and had non-reassuring heart tones.[1]

            Dr. Herrera performed
a cesarean-section delivery at 3:00 a.m. and Aniyah was moved to the neonatal
intensive care unit at 3:06 a.m.  The baby was unresponsive to stimulation even
after she was bagged and suctioned, and at 3:25 a.m. she was intubated.  After
intubation, Aniyah began breathing bilaterally and spontaneously.  Aniyah was
diagnosed as suffering from perinatal asphyxia, ischemic encephalopathy, and
placental insufficiency.  She was eventually transferred to Memorial Hermann
Children’s Hospital, where her condition continued to deteriorate until she
passed away on November 29, 2007.

            In her petition,
Holiday bases her medical-malpractice claim on several breaches of the standard
of care, including the failure to timely assess the position of the baby prior
to, during, and following Holiday’s admission to the hospital; the failure to
diagnose the unborn baby’s breech position prior to administering Cytotec to
Holiday; and failure to timely perform a cesarean delivery to prevent
complications and brain damage to the baby.  Holiday notes that Dr. Herrera
failed to perform an ultrasound examination during an October 19 appointment or
on October 20, when Holiday was admitted to Memorial Hermann for the onset of
labor but was later discharged.  Additionally, Holiday notes the assessment
that the baby was in a cephalic, head-first position when Holiday was admitted
to the hospital on October 21 was made by nurses based on a vaginal examination
rather than an ultrasound.  Holiday also complains that nurses did not obtain
reassuring fetal-strip data or employ a fetal-scalp electrode or intrauterine
pressure monitor technology prior to the administration of Cytotec.  The
defendants’ negligence in failing to meet the applicable standards of care,
Holiday contends, led to a delayed diagnosis that the unborn baby was
presenting breech and that the delay directly led to the conditions from which
Aniyah suffered and ultimately died.    

II

A medical-malpractice plaintiff must timely serve on
each party one or more expert reports that set out (1) the applicable standard
of care, (2) the manner in which the defendant’s care failed to satisfy that
standard, and (3) the causal relationship between the defendant’s failure and
the injury or damages claimed.  See Tex. Civ. Prac. & Rem. Code §
74.351(a), (r)(6).  The trial court shall grant a motion challenging the
adequacy of an expert report only if it appears to the court, after hearing,
that the report does not represent an objective good-faith effort to comply
with the statutory definition of an expert report.  See id. § 74.351(l). 
Dr. Herrera moved to dismiss Holiday’s claim on the grounds that the expert
report submitted by Dr. Douglas McIntyre was not a good-faith attempt to comply
with the requirements laid out in section 74.351.  Specifically, Dr. Herrera
claims “the report fails to explain the causal connection between alleged
breaches and the harm and injuries contended.”  We disagree.  

The Texas Supreme Court has held an expert report
must provide enough information to fulfill two purposes if it is to constitute
a good-faith effort.  Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,
46 S.W.3d 873, 879 (Tex. 2001).  First, the report must inform the defendant of
the specific conduct the plaintiff has called into question.  Id.  Second,
and equally important, the report must provide a basis for the trial court to
conclude that the claims have merit.  Id.  In fulfilling these two
requirements, the plaintiff must address the three elements identified by
statute:  standard of care, breach, and causal relationship.  Tex. Civ. Prac.
& Rem. Code § 74.351(r)(6); see also Bowie Mem’l Hosp. v. Wright, 79
S.W.3d 48, 51 (Tex. 2002).  

To satisfy the element of causation, the expert must
explain the basis of his statements and link his conclusions to the facts.  Wright,
79 S.W.3d at 52.  A plaintiff is not required to marshal all her proof or
present evidence as if the plaintiff were actually litigating the merits.  Id.;
Patel v. Williams, 237 S.W.3d 901, 904 (Tex. App.—Houston [14th Dist.]
2007, no pet.).  However, a report that merely states the expert's conclusions
about the standard of care, breach, and causation does not fulfill the two
purposes set out in Palacios.  Wright, 79 S.W.3d at 52. 
Nor does the use of “magic words” such as “reasonable medical probability”
automatically establish a good-faith effort.  Id. at 53.  Rather, the
expert must explain, to a reasonable degree, how and why the breach caused the
injury based on the facts presented.  Jelinek v. Casas, No. 08-1066,
2010 WL 4910172, at *10 (Tex. Dec. 3, 2010). 

We review a trial court’s denial of a motion to
dismiss under section 74.351 for abuse of discretion.  See Palacios, 46
S.W.3d at 877; Group v. Vicento, 164 S.W.3d 724, 727 (Tex. App.—Houston
[14th Dist.] 2005, pet. denied).  A trial court abuses its discretion if it
acts in an arbitrary or unreasonable manner without reference to any guiding
rules or principles.  Larson v. Downing, 197 S.W.3d 303, 304–05 (Tex. 2006);
Mem’l Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex.
App.—Houston [14th Dist.] 2007, no pet.). 

III

 It was within the trial court’s discretion to find that
Dr. McIntyre’s report constituted a good-faith effort at compliance with section
74.351.  Although in the report the expert ultimately identifies only one
standard of care that was breached, the expert sufficiently established a
causal link between that breach and the complications that arose during
Aniyah’s birth and her untimely death in a manner adequate to inform the
defendants of the specific conduct called into question and enable the trial
court to determine whether the claim has merit.  See Palacios, 46 S.W.3d
at 879.  

Dr. McIntyre’s 16-page report details the risks posed
by “breech presentation” and tracks Holiday’s medical history from April 13,
2007, when she first visited Dr. Herrera for prenatal care, through Aniyah’s
birth on October 21, 2007.  He opines that Aniyah ultimately died of “severe
hypoxic ischemic encephalopathy caused by intrapartum asphyxia.”  The cause of
the asphyxia, according to Dr. McIntyre, was “cord compression when Aniyah
Wright’s buttocks entered the pelvis.”  

Dr. McIntyre opines that the standards of medical
care applicable to the circumstances beginning “on or around” 2:24 a.m. would
require a physician to: (1) apply maternal oxygen; (2) reposition the patient
to relieve cord compression and or optimize uterine blood flow; (3) increase
maternal cardiac output to improve placental perfusion by maximizing fluid
status via rapidly infused intravenous fluids, and (4) improve fetal-oxygen
status by decreasing the oxygen-depriving effects of uterine contractions
and/or umbilical cord compression by administering tocolytic agents such as
terbutaline.  Dr. McIntyre states that “although the first three treatments
were instituted by the nurses, tocolytics were never administered.”  Dr. McIntyre
goes on to explain that:   

Furthermore based upon my qualifications discussed above
and in my CV, the medical science discussed in the “general section” above, the
medical facts summarized above, and the reasoning set forth supporting my
opinion that Aniyah’s injury and death was caused by intrapartum asphyxia
detailed above, it is my professional opinion that but for the negligence of
Dr. Herrera as set forth above, Aniyah would not have died from severe hypoxic
encephalopathy. As discussed in the “General Discussion” section, the
progression from hypoxia to damaging tissue asphyxia and metabolic acidosis is
a product of the severity of the hypoxia and the duration of the hypoxia. Thus,
relieving the hypoxia is the critical goal to prevent damage to the infant and
is the reason that obstetrical standards concerning intrauterine resuscitation
have been established. Thus, it is more likely than not, that had Dr. Herrera
used a tocolytic agent such as terbutaline to counter the otherwise
uncontrollable Cytotec effects and relieved the oxygen depriving effects of
contractions and/or cord compression in order to improve the intrapartum
hypoxia asphyxia/acidosis that caused Aniyah’s terminal severe hypoxic
encephalopathy, the effects of the intrapartum oxygen deprivation would have
been significantly ameliorated or eliminated. Thus, it is my professional
opinion to a reasonable degree of medical probability that Dr. Herrera's
medical negligence was a contributing factor and a proximate cause of Aniyah’s
injuries, as detailed above, and death from said injuries.

The above statements along
with Dr. McIntyre’s report taken as a whole explain that the unborn baby’s
complications during labor could be traced to the deprivation of oxygen, a condition
referred to as hypoxia.  The hypoxia became pronounced as baby Aniyah descended
into the pelvis in breech and suffered the oxygen-depriving effects of uterine
contractions and cord compression.  During this time, Dr. McIntyre explains, a
tocolytic agent should have been administered to offset the effects of Cytotec,
a labor-inducing drug that was earlier administered to Holiday.  Dr. McIntyre
explains that doing so would have countered the “uncontrollable” effects of
Cytotec and increased the flow of oxygen to the baby.  Dr. McIntyre explains
the ultimate cause of Aniyah’s death and links the breached standard of care—the
failure to dispense a particular medication—to the unfortunate result in this
case and then establishes causation by explaining the medication would have
“significantly ameliorated or eliminated” the oxygen deprivation Aniyah was
suffering.  

Although this explanation may not conclusively
establish Holiday’s claim, it is a fair summary with sufficiently specific
information to demonstrate causation beyond mere conjecture.  See Tex.
Civ. Prac. & Rem. Code § 74.351(r)(6); Wright, 79 S.W.3d at 53.  Moreover,
it fulfills both elements of the Palacios test because it informs Dr.
Herrera of the specific conduct called into question—the failure to administer
a tocolytic agent—and provides sufficient information for the trial court to
determine whether the claim has merit.  See Palacios, 46 S.W.3d at 879. 
The statute does not require more. 

Dr. Herrera argues the report in this case is similar
to one deemed insufficient by the San Antonio court of appeals in Hutchnison
v. Montemayor.  144 S.W.3d 614, 618 (Tex. App.—San Antonio 2004, no pet.). 
In that case, the court held the trial court did not abuse its discretion in
finding the report was not a good-faith effort because the report simply opined
that the plaintiff might have had the possibility of a better outcome without
explaining how the defendant’s conduct caused injury.  Id. at 617.  The Hutchinson
expert opined that:

If an arteriogram had been done, there would have been a
possibility that Mr. Hutchinson may have had bypassable lesions and
that the amputation may have been avoided.  Within reasonable medical
probability these doctor’s [sic] breaches caused injury to Mr. Hutchinson. 


Id. (emphasis added). 
The causation element was not fulfilled because the expert failed to link the
defendants’ inaction (failure to perform an arteriogram) to the injury (an
amputation).  Id.  Dr. McIntyre’s report is not similarly lacking.  Unlike
Hutchinson, in which the expert physician opined that there “would have
been a possibility . . . that the amputation may have been avoided,” in the
case under review Dr. McIntyre does not simply speculate about the possibility
of a better outcome.  See id.  Rather, Dr. McIntyre states that a
tocolytic agent would have “significantly ameliorated or eliminated” the
oxygen-depriving effects of uterine contractions and cord compression, and that
the failure to administer the medication “was a contributing factor and
proximate cause” of Aniyah’s injuries and death.  While the adequacy of an
expert report does not hinge on any “magical words,” in his report Dr. McIntyre
does more than merely speculate about a better outcome; he states that Dr.
Herrera’s omission caused complications in Aniyah’s birth and Dr. McInyre demonstrates
the causal link between the failure to administer a tocolytic agent and the
oxygen-depriving conditions that ultimately led to Aniyah’s death.  See
Wright, 79 S.W.3d at 53; Palacios, 46 S.W.3d at 879.

Moreover, in Hutchison the trial court granted
the motion to dismiss and the court of appeals held it had not abused its
discretion.  Likewise, we have held that the trial court in this case did not abuse
its discretion when it denied the motion to dismiss.  In the case  under
review and in Hutchison, the trial court’s rulings are very
appropriately afforded wide discretion.

* * *

Dr. McIntyre’s report represented a good-faith effort
to satisfy the requirements imposed by section 74.351 and by the supreme court
in Palacios.  Accordingly, the trial court did not abuse its discretion
in denying Dr. Herrera’s motion to dismiss.  We overrule Dr. Herrera’s sole
issue.  For the foregoing reasons, we affirm the trial court’s judgment.  

 

 

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

 

Panel consists of Justices
Anderson, Frost, and Brown.  









[1] A breech presentation
occurs when the baby enters the birth canal with the buttocks or feet first as
opposed to the normal head-first presentation.