

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00286-CV

COLUMBIA NORTH HILLS                                          APPELLANT
HOSPITAL SUBSIDIARY, L.P.
D/B/A NORTH HILLS HOSPITAL

V.

LARRY G. BOWEN                                               APPELLEE

----------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is an interlocutory appeal. The trial court denied a motion to dismiss the health care liability claims of Appellee Larry G. Bowen against Appellant Columbia North Hills Hospital Subsidiary, L.P. d/b/a North Hills Hospital (Hospital). Hospital brings four issues challenging the trial court's ruling on

---

[1]*See* Tex. R. App. P. 47.4.

Hospital's objections to Bowen's expert report and its failure to dismiss Bowen's claims and award Hospital attorney's fees. Because we hold that the trial court did not abuse its discretion by overruling Hospital's objections, we affirm the trial court's order.

## Background

*The Injuries*

Bowen sued Hospital, Dr. Dustin Ray, and others for injuries sustained in procedures that were supposed to address problems with his hand. Bowen alleged in his petition that in September 2010, he consulted Ray at Allied Orthopedic, DFW, P.A. for pain in his right thumb. At a subsequent visit, Ray determined that Bowen needed carpel tunnel surgery on his right hand.

At that same visit, Ray also tested Bowen's left hand and determined that Bowen needed surgery on his left elbow. Bowen had minor complaints of slight weakness in his left hand and pain in his left thumb, and Ray told Bowen that this surgery would restore any loss of strength in his left hand. Bowen's claims in this suit relate to the treatment of his left elbow. No complications arose from Ray's treatment of Bowen's right hand.

On January 11, 2011, Ray performed surgery on Bowen's left elbow at Southwest Surgical Hospital. During the surgery, Bowen's ulnar nerve was severed.

After the surgery, Bowen began experiencing numbness and weakness in his left hand. He complained of the problem to Ray in a January 21, 2011 follow-

2

up appointment but was told to wait six weeks to see if the numbness subsided. On March 4, 2011, Bowen had a follow-up appointment with Ray. Based on that appointment, Ray decided to perform an ulnar decompression surgery of Bowen's left elbow. Ray admitted Bowen to North Hills Hospital that afternoon and performed the procedure. The symptoms did not improve.

On March 15, 2011, Bowen consulted neurologist Dr. Stephen Troum for a second opinion. After performing some tests, Troum advised Bowen that the ulnar nerve was dead and that in his opinion, Ray had cut the nerve during the prior elbow surgery. Bowen consulted a second neurologist who reached the same conclusion that the nerve was dead.

*The Lawsuit*

In his petition, Bowen alleged various acts of negligence but did not specify which defendants committed what negligent acts. The listed acts of negligence included allegations that the defendants had done or failed to do the following:

> e. Discharged Mr. Bowen from their care with a severed and unrepaired ulnar nerve;
>
> . . .
>
> g. Failed to provide appropriate and timely follow-up care to Mr. Bowen to address, treat, and resolve the issues arising from the procedures performed on him;
>
> h. Failed to properly supervise, train, and/or monitor Dr. Dustin Ray and its other employees or agents;
>
> i. Failed to require Dr. Dustin Ray and their employees to adequately document the surgeries performed on Mr. Bowen and/or failed to adequately monitor and/or follow-up with Dr. Dustin Ray

3

and/or their employees or agents to ensure compliance with any documentation requirements for the surgeries; and

j. Otherwise failed to properly manage Mr. Bowen's medical conditions and care and failed to properly treat and monitor Mr. Bowen.

The trial court subsequently granted Bowen's nonsuit of his claims against Ray.

*The Expert Report and Motion to Dismiss*

Bowen served Hospital with an expert report from Dr. William J. Van Wyk, a hand and upper extremity specialist who is board certified in orthopedic surgery. Van Wyk stated that a nerve injury "is best seen and treated immediately by surgery" and that a nerve laceration "is very easy to identify on immediate re-operation and certainly has an increased chance of a good repair and improved outcome." But at six weeks, the nerve will have healed over, and a scar will have formed "that is difficult to dissect without possibly injuring a portion of the nerve that might not be injured."

Hospital filed objections to Van Wyk's report and a motion to dismiss. It asserted that Van Wyk's report and curriculum vitae did not demonstrate that he has the experience or training qualifying him to discuss the standard of care applicable to a hospital. The motion also asserted that Van Wyk's report does not set forth with specificity the standard of care that applies to Hospital, that the report does not delineate how Hospital breached any standard of care, and that it does not sufficiently set forth how any alleged breach by Hospital caused Bowen's injuries.

4

After a hearing, the trial court denied the motion to dismiss. Hospital now appeals.

## Standard of Review

We review for abuse of discretion both a trial court's denial of a motion to dismiss under section 74.351 and a trial court's determination of an expert's qualifications.[2] A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.[3]

## Analysis

In its first issue, Hospital asks whether the trial court abused its discretion in overruling its objections that Van Wyk's report failed to establish his qualifications for offering expert opinions as to the cause of Bowen's injuries with respect to Hospital. It argues that Van Wyk's report and curriculum vitae do not demonstrate that he has the experience or training qualifying him to discuss the standard of care applicable to a hospital. It asserts that he "is not a nurse and is therefore unqualified to render any opinions regarding any vicarious liability claims related to the nursing staff" and that he "has not set forth any background, training[,] or experience that would qualify him to render any opinions regarding

---

[2]*Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 266 (Tex. App.—Fort Worth 2009, no pet.).

[3]*Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

5

the direct liability claims against [Hospital], including supervising and monitoring" Ray.

A plaintiff in a health care liability claim must provide an expert report in support of the claim.[4]  To qualify as an "expert report," the report must be by an "expert" as that term is defined in the statute.[5]  As to "the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim," an expert is "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence."[6]  Texas Rule of Evidence 702 states that a witness may testify on "scientific, technical, or other specialized knowledge" if the witness is qualified as an expert on the matter "by knowledge, skill, experience, training, or education."[7]

On the question of whether a health care provider departed from accepted standards of health care, an "expert" is someone qualified to testify under the requirements set out in civil practice and remedies code section 74.402.[8]  To qualify as an expert under that section, a person must have knowledge of

---

[4]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West Supp. 2013).

[5]*Id.* § 74.351(r)(5) (defining "expert" for purposes of the statute).

[6]*Id.* § 74.351(r)(5)(C).

[7]Tex. R. Evid. 702.

[8]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B).

accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.[9] The person must also be qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care, which means that the person must be "(1) certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and (2) actively practicing health care in rendering health care services relevant to the claim."[10] An expert's qualifications in a health care liability suit must be determined based solely on the report and the expert's curriculum vitae.[11]

Van Wyk's report states that he is a hand and upper extremity specialist who has been practicing since 1972. He is board certified in orthopedic surgery and has taught courses for hand surgeons. Van Wyk's curriculum vitae states that he served as the medical director for Fort Worth Surgery Center from 1988 to 2004. He served on both the executive board and the credentialing committee for that facility. He has also taught nursing continuing education courses. His report and C.V. show that he is a licensed physician and is qualified by training and experience to know the standard of care for nurses and for health care

---

[9]*Id.* § 74.402(b)(2) (West 2011).

[10]*Id.* § 74.402(b)(3), (c).

[11]*Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.).

providers such as Hospital.  We therefore hold that the trial court did not abuse its discretion by determining that Van Wyk was qualified to opine on the standard of care applicable to Hospital.  Accordingly, we overrule Hospital's first issue.

Hospital asks in its second issue whether the trial court abused its discretion by overruling its objections to the sufficiency of Van Wyk's report, specifically, that the report failed to set forth the applicable standard of care or identify how Hospital breached that standard of care.  Hospital argues that Van Wyk's report does not set forth with any specificity the standard that applies to Hospital, does not segregate out the standards of care among the various defendants, does not delineate how Hospital breached any standard of care, and is conclusory and overbroad in that it does not outline what type of supervision or monitoring Hospital should have provided Ray or why Hospital should not have credentialed Ray.  It further argues that the report does not make clear why Hospital had any duty to monitor or supervise Ray during his surgeries.

An expert report must make a good faith effort to comply with the definition of an expert report.[12]  The definition of "expert report" sets out three elements the report must satisfy to be valid:  "it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and

_____

[12]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*).

8

the harm alleged."[13]  The report need not be sufficient as to every claim against a defendant; the suit may move forward against the defendant if it is sufficient as to any claim against that defendant.[14]

Regarding the standard of care for Hospital, the report stated the following:

- Hospital "lists Dr. Ray as one of their doctors to the community.  As such, [Hospital] has a responsibility to supervise and monitor the activities of Dr. Ray.  The hospital approves privileges and must be sure the standard of care is maintained."  Hospital had a "duty to monitor and train Dr. Ray."

- "The scrub nurses and circulating nurses employed by [Hospital] must describe accurately the procedures performed in the operating room as does the anesthesiologist."

- "By their experience, the suture and materials used in the surgical case, and the discussion in the process of the operation, the nurses have an understanding of what surgery and procedures are being performed.  They must put that correct information in the medical record."

- "If there is any problem, complication or change in the scheduled procedure the nurses and anesthesiologist must make accurate notes.  To not correctly write down the procedure known to be performed would be improper.  This would be outside the standard of care for the hospital."

- Hospital "had the responsibility to question the emergency nature of this surgery and insure the patient was fully informed of the nature of his problem, was aware of all his options, and

---

[13]*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013); (construing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6)).

[14]*See TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013) (stating that an expert report is not required as to each liability theory alleged against a defendant).

9

that all options for treatment during this rushed surgery were available."

Regarding the breach of the standard of care, Van Wyk's report stated:

- Bowen was "hustled off to an almost 5 hour emergency surgery" at Hospital "in spite of the fact he was not NPO (without eating and drinking), not properly informed and not prepped properly for an elective surgery."

- Hospital allowed this rush to surgery to occur, and "[n]o one at [Hospital] questioned adding this almost 5 hour case on as an emergency without following routine and proper preoperative procedures."

- "A full documentation of the injury had not been made," and the hand surgery evaluation was poorly documented in the rush to surgery. "The disclosures that should have occurred during the preoperative period were not explained to the patient."

- "Rushing the patient to a nearly 5 hour surgery in a nonemergency situation at six weeks without proper preoperative procedures, not properly NPO (without eating or drinking for 8 hours) exposed him to a surgical danger not necessary in this elective surgery," and this course of action by Hospital "exposed the patient to unnecessary surgical risk by taking Mr. Bowen to surgery in a rush."

- Hospital "did not question or prevent this non-emergent rush to surgery with the patient not NPO and not previously scheduled in the normal manner for elective surgery," and "there was absolutely no reason to take the patient to surgery in a rush that same day and expose him to a general anesthesia and a long operative procedure."

- "I am unaware of any documentation that the operative surgeon had appropriate, adequate training, or updated training in this endoscopic cubital tunnel procedure," and "I see no documentation on record with . . . [Hospital] that Dr. Ray had completed certification to be allowed to perform cubital tunnel or carpal tunnel endoscopic surgery."

Finally, Van Wyk stated of Hospital:

10

The question remains, what were the true findings of the second surgery and was the information the patient was given reasonable and true? The assistant surgeon, Dr. Whittaker (listed in the anesthesia record of North Hills Hospital for the 3-4-11 surgery) on the second surgery of the elbow had a ring side seat and if the nerve was cut he should be forthcoming. Why wasn't Dr. Whittaker listed by Dr. Ray in the operative note? The hospital knew the surgical procedure performed because the circulating nurse, scrub nurse and anesthesiologist that worked for the hospital were present and documented the procedure. The hospital records show a long surgery of 4.75 hours (operation began at 4:47pm and finished at 9:34pm) and what appears to be a surgical procedure different than a removal of scar around a 1.5 cm initial incision. The hospital failed to investigate and monitor the procedure performed and follow up with the patient on his outcome. Why was an assistant surgeon used in this small case if it was indeed a small case to just remove the nerve from a 1.5 cm scar? Why did the procedure take 4.75 hours? Payment for an assistant surgeon is usually reserved for a long, hard complex case and is usually not paid for by Medicare in a simple case. To me this is an example of overcharging Medicare by billing for a second surgeon. Why did it take a nearly 5 hour operation to correct scaring from 1.5 cm incision that took only 12 minutes originally? Some operative facts seem missing here.

This report asserts among other things that Hospital had the duty to supervise and monitor Ray, which it did not do; that Hospital had a duty to question the emergency nature of the surgery and to insure that Bowen was fully informed, which it did not do; and that nurses had a duty to provide accurate documentation, yet operative facts appeared to be missing from the record. We hold that the report fairly summarized the applicable standard of care for Hospital and explained how Hospital failed to meet that standard.[15] Accordingly, we overrule Hospital's second issue.

---

[15]*See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

Hospital's third issue asks whether the trial court abused its discretion by overruling Appellant's objections that Dr. Van Wyk's report failed to establish a causal connection between North Hills Hospital's alleged misconduct and Bowen's injuries. The expert report in a health care liability suit must discuss causation with sufficient specificity (1) to inform the defendant health care provider of the conduct that the plaintiff has called into question and (2) to provide a basis for the trial court to conclude that the claims have merit.[16] Within the report, "the expert must explain the basis of his [or her] statements to link his [or her] conclusions to the facts."[17] Hospital asserts that Van Wyk's report is conclusory and that Van Wyk fails to state that the breaches of the standard of care by Hospital were a contributing cause of Bowen's injuries.

Regarding causation, Van Wyk stated that because of Hospital's breach, Bowen underwent a second surgery that, under the circumstances of the surgery, had no chance of improving his condition.[18] "[Hospital's] . . . actions and failure to act were a contributing cause of Larry Bowen's problem." He also asserted that "[Hospital] by questioning the necessity of this rushed surgery could have resulted in a better outcome. . . . Not doing the best and definitive

---

[16]*Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

[17]*Id.*

[18]*See, e.g.*, *Ranelle v. Beavers*, No. 02-08-00437-CV, 2009 WL 1176445, at *5–6 (Tex. App.—Fort Worth Apr. 30, 2009, no pet.) (mem. op.) (upholding a trial court's failure to dismiss a health care liability claim asserting negligence based on an unnecessary surgery).

procedure for the second operation on the ulnar nerve could have precluded the best result and outcome for Larry Bowen." Because of Hospital's breach of its duty, among other things, Bowen underwent an unnecessary surgery and was later forced to obtain a second opinion from another doctor, when he could have learned of the severed nerve before the surgery if Hospital had followed proper procedures.[19] We hold that the report adequately discusses causation so as to inform Hospital of the conduct that Bowen has called into question and to provide a basis for the trial court to conclude that Bowen's claims have merit.[20] We overrule Hospital's third issue.

Hospital's fourth and final issue asks whether the trial court abused its discretion by failing to dismiss Bowen's health care liability claim with prejudice and award attorney's fees. Because we have held that the trial court did not abuse its discretion by overruling Hospital's objections to Van Wyk's report, we need not address this issue.[21]

**Conclusion**

Having overruled Hospital's issues, we affirm the trial court's order denying Hospital's motion to dismiss.

---

[19]These statements are in addition to Van Wyk's statements that suggest that Hospital by failing to follow proper preoperative procedures and proper procedure documentation, at the least, created a situation under which Medicare fraud may have occurred.

[20]*See Jelinek*, 328 S.W.3d at 539.

[21]*See* Tex. R. App. P. 47.1.

13

                                           /s/ Lee Ann Dauphinot
                                           LEE ANN DAUPHINOT
                                           JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED:  January 30, 2014