

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00047-CV

NEXION HEALTH AT NORTH
RICHLAND HILLS, INC. D/B/A
GREEN VALLEY HEALTHCARE
AND REHABILITATION CENTER
AND NEXION HEALTH
MANAGEMENT, INC. D/B/A GREEN
VALLEY HEALTHCARE AND
REHABILITATION CENTER

APPELLANTS

V.

STEPHANIE STREET-LARSON,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF ALVIA BLEDSOE,
DECEASED

APPELLEE

----------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 067-271867-14

----------

## MEMORANDUM OPINION[1]

----

[1]*See* Tex. R. App. P. 47.4.

----------

This is a health care liability suit. Appellee Stephanie Street-Larson, Individually and as Representative of the Estate of Alvia Bledsoe, Deceased, sued two entities: Appellant Nexion Health at North Richland Hills, Inc. d/b/a Green Valley Healthcare and Rehabilitation Center (Health) and Appellant Nexion Health Management, Inc. d/b/a Green Valley Healthcare and Rehabilitation Center (Management) (collectively the Nexion entities). Her claims were based on allegations of abuse and neglect of her father, Alvia Bledsoe, while he was in the care of a nursing facility owned and operated by the Nexion entities. The trial court denied the motion to dismiss filed by the Nexion entities under section 74.351 of the civil practice and remedies code.[2] In three issues, the Nexion entities argue that the trial court abused its discretion by denying their motion. Because we hold that the expert report served on the entities by Street-Larson was adequate, we affirm the trial court's order.

**Background**

Street-Larson alleged that Bledsoe had been a resident of the facility from May 1, 2011, through June 9, 2012, and that he died on June 15, 2012, due to the negligent acts and omissions of the Nexion entities. She further alleged, however, that Bledsoe was discharged from the facility on April 29, 2012, and was then admitted to a hospital.

---

[2]Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2011 & Supp. 2014).

2

Upon Bledsoe's admission to the hospital, physicians discovered four pressure ulcers on his body. Street-Larson alleged that doctors also diagnosed him with a severe urinary tract infection, sepsis, malnutrition, bronchitis, and acute renal failure. Bledsoe died on June 15, 2012. Street-Larson sued and served the Nexion entities with the expert report of Dr. Lige B. Rushing.

Dr. Rushing specializes in internal medicine and rheumatology. In his report, Dr. Rushing discussed the care and treatment provided by "Green Valley Healthcare and Rehabilitation and its staff (hereinafter referred to collectively as 'Defendants')". His report did not use the names Nexion Health at North Richland Hills, Inc. or Nexion Health Management, Inc.; he referred only to "Green Valley Healthcare and Rehabilitation," "Green Valley," "the facility," and "Defendants." Dr. Rushing described the standard of care for the facility, stated that none of these standards were met, and described how pressure ulcers formed on Bledsoe as a result of the facility's failure to meet the standard of care. Dr. Rushing stated that Bledsoe was a resident of the facility through June 9, 2012, but also stated that Bledsoe was transferred from the facility on April 29, 2012.

The Nexion entities filed a motion to dismiss. They asserted that the report "fail[ed] to implicate any conduct of" Management and failed to explain the causal relationship between Health's acts and Bledsoe's injuries and death. In response, Street-Larson argued that the report was adequate as to causation and that the expert report implicated the conduct of both defendants.

3

The trial court denied the motion to dismiss. Management and Health then brought this interlocutory appeal.[3]

## Standard of Review

We review for an abuse of discretion a trial court's denial of a motion to dismiss under section 74.351.[4] A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.[5]

## Discussion

In their first issue, the Nexion entities argue that the trial court abused its discretion by denying the motion to dismiss as to Health because Dr. Rushing's report fails to establish the causal relationship between the alleged harm and Health's conduct.

A plaintiff in a health care liability claim must provide an expert report in support of the claim.[6] For an expert report to be sufficient, it must fairly summarize the standard of care applicable to the health care provider; it must

---

[3]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West 2015) (providing that a person may appeal from an interlocutory order denying a motion to dismiss under section 74.351).

[4]*Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 266 (Tex. App.—Fort Worth 2009, no pet.).

[5]*Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

[6]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

4

explain how the health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged.[7] Regarding the causation element, the expert report must discuss causation with sufficient specificity (1) to inform the defendant health care provider of the conduct that the plaintiff has called into question and (2) to provide a basis for the trial court to conclude that the claims have merit.[8] Within the report, "'the expert must explain the basis of his [or her] statements to link his [or her] conclusions to the facts.'"[9]

Street-Larson alleged in her petition that due to the Nexion entities' negligence, her father "suffered substantial injury and damages including . . . Bledsoe's pain and suffering leading up to his untimely death." She more specifically alleged that their negligence led to her father developing four pressure ulcers, as well as "a severe urinary tract infection, sepsis, malnutrition, bronchitis[,] and acute renal failure."

The main focus of Dr. Rushing's report was the pressure ulcers. Describing the standard of care and the breach of that standard by the Nexion entities' operators and staff, he stated,

---

[7]*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) (construing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6)).

[8]*Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

[9]*Id.* (citation omitted).

5

The standard of care for a skilled nursing care facility requires that they neither accept nor retain a resident whose needs they cannot meet. One of Mr. Bledsoe's needs was the prevention of the development of decubitus ulcers. He clearly developed decubitus ulcers while he was a resident at Green Valley. . . . [T]hey knew or should have known that he was at high risk for the development of pressure ulcers and infections because of his limited mobility and advanced age. In order to meet the standard of care, Green Valley Healthcare and Rehabilitation should have provided an appropriate pressure ulcer prevention program. This would consist of but not be limited to a special mattress surface such as a low air loss mattress or equivalent, [and] a regular turning and repositioning program every two hours with documentation each time he was turned and repositioned. There should have been regular[ly] scheduled and documented head to toe skin assessments at least once a week. There is an occasional note in the chart that he was turned and repositioned but this does not meet the standard of care. It should have been abundantly clear to all of his caregivers that his needs were not being met when he developed pressure ulcers. The standard of care required that his caregivers notify his treating physician and the family that they are unable to meet his needs and that he should be transferred to another facility or receive care from another health agency that could indeed meet his needs[,] i.e.[,] proper management for the prevention and treatment of pressure ulcers. In Mr. Bledsoe's case, based on the comprehensive assessment of the resident, the facility and health agencies must insure that a resident who enters the facility without pressure ulcers does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable and a resident having pressure ulcers receive the necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing. There is nothing in Mr. Bledsoe's clinical condition to indicate that his pressure ulcers were unavoidable.

. . . .

In summary, the care and treatment rendered to Mr. Bledsoe by Green Valley Healthcare and Rehabilitation fell below the accepted standard care the following ways:

1. Accepted and retained a patient whose needs they could not meet.

6

2. Failed to have appropriate pressure ulcer prevention program.

3. Failed to properly treat Mr. Bledsoe's pressure ulcer.

4. Failed to keep appropriate records.

5. Failed to prevent Mr. Bledsoe's pressure ulcer.

The report, then, described the standard of care applicable to the Nexion entities and its staff for preventing pressure ulcers from developing and for preventing any existing pressure ulcers from becoming infected. The report further described how the facility and its staff failed to meet that standard. Dr. Rushing then went on to describe how this failure caused Bledsoe to develop pressure ulcers. He stated,

> When prolonged pressure, i.e.[,] longer than two hours is present [on a] body part and this pressure exceeds approximately 32 mmHg, the capillaries are compressed and the blood flow to the affected part is shut off. Capillaries are the smallest vessels that connect the arteries and the veins. Capillaries have very thin walls and it is through the walls of these tiny blood vessels that oxygen and nutrients pass into the surrounding tissue to be utilized. All living tissue in the body requires oxygen and nutrients to stay alive and to function. When the tissues are deprived of blood flow, oxygen and nutrients, then the death of tissue occurs, the medical term for this is necrosis, and in layman's terms, the tissue simply dies and decays. *This is precisely what happened in this case*. Unrelieved pressure on a capillary is just like placing one's foot on a garden hose, compressing it, and shutting off the flow. *This is what happened in Mr. Bledsoe's case*: his capillaries were compressed; the blood flow was shut off from the tissues; the tissues died and became necrotic or decayed. It is in this decayed necrotic material that bacteria or germs set up housekeeping. This decayed tissue is an ideal culture medium for bacteria. It is rich in nutrients upon which bacteria thrive. Bacteria from the skin invade the necrotic tissue and multiply virtually unopposed. There is no blood supply to the necrotic tissue and therefore oxygen, nutrients, and white blood cells cannot be delivered to affected area to fight the infection. The infection by germs causes inflammation via toxins released by the bacteria. These toxins cause the production of chemical mediators,

7

two examples of which are tumor necrosis factor alpha and interleukin-6. These chemical mediators themselves cause tissue destruction when unregulated which in turn generates more chemical mediators (called cytokines). This process may become a self-perpetuating, unregulated, and a malignant process. In addition, Mr. Bledsoe had known low hemoglobin levels. This is one process by which pressure ulcers become larger and *this is what happened in this case*. [Emphasis added.]

> . . . .

> . . . It is my opinion that the events and failures set forth in this report proximately caused Mr. Bledsoe's injuries. Specifically, as a result of Defendants' tortious misconduct described above, Mr. Bledsoe had prolonged, unrelieved pressure on his left hip, coccyx, right lateral foot and right heel. This pressure shut off the blood flow. When the blood flow was shut off, the tissue/skin died and decayed. Bacteria invaded the dead tissue and multiplied. These bacteria then invaded the surrounding normal tissue causing more dead and decayed tissue to form with more infection. This became a self-perpetuating event which caused progressive deterioration of his infections, which left untreated resulted in Mr. Bledsoe's untimely death.

> The malnutrition, pneumonia and failure to monitor also complicated Mr. Bledsoe's infection and contributed to his overall untimely decline in condition and death. Had reasonable steps been taken to treat his infection and provide appropriate monitoring, to a reasonable degree of medical probability, Mr. Bledsoe's life could have been prolonged and his pain and suffering reduced.

Dr. Rushing also stated that Bledsoe's records noted no pressure ulcers or skin breakdowns at the time he entered the facility. This report describes how the breach of the standard of care led to Bledsoe developing pressure ulcers and how the ulcers became infected. The report thus explains the causal link between breaches of the standard of care by the facility and employees of the Nexion entities and the injury (pressure ulcers) suffered by Bledsoe as alleged by

8

Street-Larson. The report therefore discusses causation with sufficient specificity to meet the requirements of an expert report.

The Nexion entities further challenge the report based on conflicting dates listed in the report. As noted, Dr. Rushing states in the report that Bledsoe "was a resident at the Green Valley Healthcare and Rehabilitation facility from on or about September 3, 2011, until June 9, 2012," but he also states that "[o]n or about April 29, 2012, Mr. Bledsoe was transferred to Texas Health Harris HEB [hospital] after experiencing altered mental state." The Nexion entities argue that "that Dr. Rushing's report is unclear regarding the date that Mr. Bledsoe actually left the facility, precluding any definitive determination of when or where Mr. Bledsoe's injuries occurred." We disagree.

Taking Dr. Rushing's entire report in context, he reports that Bledsoe was taken from Green Valley to a hospital and that the pressure ulcers were discovered upon Bledsoe's admission there. The report creates no confusion about Bledsoe's developing the pressure ulcers while at the facility operated by the Nexion entities. Regardless of the date that Bledsoe left the facility for the hospital or was officially discharged from it, the report makes clear that Bledsoe had no pressure ulcers when he entered the facility and that he had them upon his admission to the hospital. And we observe that the purpose of the report is, in part, to inform the defendant health care provider of the conduct that the plaintiff has called into question, that the Nexion entities know from their own

9

records what date Bledsoe was discharged from their facility, and that this report informs them of the conduct that Street-Larson is challenging.

We hold that the expert report was sufficient as to causation. We overrule the Nexion entities' first issue.

The Nexion entities assert in their second issue that the trial court abused its discretion when it denied the motion to dismiss as to Management because the report does not address Management's conduct. We disagree.

When a health care liability claim against a health care provider involves a vicarious liability theory, an expert report need only meet the statutory standards as to the health care provider's employee in order to satisfy the expert report requirement.[10] A report that does so is sufficient to implicate the employer's conduct under the vicarious liability theory.[11] When the employer is sued under a vicarious liability theory and an expert report is served on the employer that meets the expert report requirements as to an employee, the employer has been made aware of the conduct that is at issue.[12]

---

[10] *Potts*, 392 S.W.3d at 632.

[11] *Id.*; *see also Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008).

[12] *See Potts*, 392 S.W.3d at 630 (stating that one purpose of the expert report is to inform the defendant of the specific conduct that the plaintiff has called into question).

In her petition, Street-Larson referred to both Nexion entities as doing business as "Green Valley Healthcare and Rehabilitation Center."[13]  She referred to the center as "the Facility."  She then referred to the entities collectively as "Defendants," and she alleged that each "Defendant" "owned, managed, operated, supervised, and/or staffed the nursing facility."  As noted, Dr. Rushing's report did not refer to either Nexion entity and instead used the names "Green Valley Healthcare and Rehabilitation," "Green Valley," "the facility," and "Defendants."

Dr. Rushing's report described the standard of care applicable to the facility and its staff, including the nurses and nursing assistants who provided care to Bledsoe, described how the care and treatment provided by them fell short of that standard, and explained how that breach caused the alleged injuries to Bledsoe.  The report therefore meets the standard of care as to Management's employees, and, accordingly, the report was sufficient as to Management.  We overrule the Nexion entities' second issue.

In their third issue, the Nexion entities argue that the trial court abused its discretion by denying their motion to dismiss because Street-Larson failed to submit any report addressing Management's conduct and because, regarding Health, Dr. Rushing failed to provide adequate opinions on causation.  Their only

---

[13]Management, however, referred to itself in its answer and motion to dismiss, as well as in its notice of appeal, as simply "Nexion Health Management, Inc."

11

new argument under this issue is an argument that Street-Larson should not be given an opportunity to cure the deficiencies in Dr. Rushing's report.[14] Because we have held that the expert report was sufficient, we overrule this issue.

## Conclusion

Having overruled each of the Nexion entities' three issues, we affirm the trial court's order denying the motion to dismiss.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MEIER, JJ.

DELIVERED:  June 18, 2015

---

[14]*See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) (providing that if an expert report is found deficient, "the court may grant one 30-day extension to the claimant in order to cure the deficiency").