# NO. 12-14-00357-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER, APPELLANTS* | *§* | *APPEAL FROM THE 114TH* |
| *V.* | | |
| | *§* | *JUDICIAL DISTRICT COURT* |
| *TASCO BAILEY, NATHAN BAILEY, CARLIE BAILEY, ROY BAILEY, BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP AND LICILLE MARTIN, AS HEIRS OF ARCHIE BAILEY, APPELLEES* | *§* | *SMITH COUNTY, TEXAS* |

## MEMORANDUM OPINION

Pinecrest SNF, LLC d/b/a Pinecrest Nursing & Rehabilitation Center appeals the trial court's order denying its motion to dismiss the claims against it in a suit filed by Tasco Bailey, Nathan Bailey, Carlie Bailey, Roy Bailey, Bill Bailey, James Bailey, Earl Bailey, Mary Dunlap and Licille Martin, as heirs of Archie Bailey (the Baileys). In its sole issue, Pinecrest argues that the trial court abused its discretion when it overruled Pinecrest's objections to the Baileys' suit for failure to comply with the expert report requirements under Chapter 74 of the Texas Civil Practice and Remedies Code.[1] We affirm.

## BACKGROUND

On June 12, 2010, Archie Bailey was admitted to Pinecrest for long-term care related to her Alzheimer's disease. She was eighty-eight years old and had a history of hypertension,

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West Supp. 2015).

congestive heart failure, diabetes mellitus, and asthma. Bailey required total assistance with all activities of daily living.

In August 2013, Bailey developed a pressure ulcer on her sacrum.[2] The ulcer continued to worsen, and on September 19, 2013, Bailey was discharged from Pinecrest and transferred to Trinity Mother Frances Hospital (TMF). Upon admission, Bailey was diagnosed with a Stage IV decubitus ulcer on her sacrum, a Stage II pressure ulcer on her left buttock, leukocytosis, and a urinary tract infection. Bailey's nutritional status was described as "severely compromised," resulting in malnourishment. TMF transferred Bailey to Tyler ContinueCARE Hospital for further treatment and management of her wounds, where she developed another Stage II pressure ulcer on her right buttock. Bailey had several surgical debridements, and other treatments such as placement of a "wound VAC" and aggressive antibiotic therapy, from late September until her discharge on October 22, 2013, to Colonial Tyler Care Center. There, Bailey continued to receive negative pressure therapy and a therapeutic diet to promote wound healing. Her condition did not improve, and she was placed on hospice care. Bailey died on December 4, 2013. Her death certificate indicates that she died from cardiopulmonary arrest.

The Baileys filed suit against Pinecrest, alleging that it was negligent in allowing the development and progression of Bailey's pressure ulcers. The Baileys attempted to comply with the statutory expert report requirements under Chapter 74 of the Texas Civil Practice and Remedies Code by filing the report of their expert, Christopher M. Davey, M.D. Pinecrest filed written objections to the report. The trial court ruled that Dr. Davey's report was insufficient, but allowed the Baileys time to amend the report and cure its deficiencies. Dr. Davey amended his report, and Pinecrest again filed written objections to Dr. Davey's report on the grounds that his opinions regarding causation were conclusory. The trial court overruled Pinecrest's objections, and this interlocutory appeal followed.[3]

## EXPERT REPORT

In its sole issue, Pinecrest argues that Dr. Davey's report on causation is conclusory.

---

[2] Bailey had previously developed a pressure ulcer in March 2013, but the ulcer resolved by early April 2013.

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2015).

2

**Standard of Review**

A trial court's ruling on the sufficiency of an expert's report is reviewed for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* However, in exercising its discretion, it is incumbent upon the trial court to review the report, sort out its content, resolve any inconsistencies, and decide whether the report demonstrated a good faith effort to show that the plaintiff's claims have merit. *See id.* at 144. When reviewing factual matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial court. *Id.*

**Applicable Law**

Chapter 74 of the civil practice and remedies code governs health care liability claims. *Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.*, 269 S.W.3d 314, 316 n.3 (Tex. App.–Dallas 2008, no pet.). Any person who brings suit asserting a health care liability claim must provide an expert report for each physician or health care provider against whom a health care liability claim is asserted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2015). An "expert report" is defined as a written report that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards of care, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51 (Tex. 2002) (per curiam). Although a claimant must timely file an adequate expert report as to each defendant in a health care liability suit, Chapter 74 does not require an expert report as to each liability theory alleged against that defendant. *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 45 (Tex. 2013); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013). Rather, a single liability theory meeting the statutory requirements is sufficient to defeat a motion challenging the adequacy of an expert report. *Certified EMS*, 392 S.W.3d at 632.

A trial court shall grant such a motion only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of "expert report" in section 74.351(r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). To represent an objective good faith effort to comply with statutory requirements, the expert report must (1) inform the defendant of

3

the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Loaisiga*, 379 S.W.3d at 260; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001).

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm, and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.–San Antonio 2004, no pet.). Causation is often established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants. *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010). In other words, the plaintiff must present evidence "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.–Texarkana 2012, no pet.).

A report is deficient if it states only the expert's conclusions about the standard of care, breach of the standard of care, or causation. *See Ortiz v. Patterson*, 378 S.W.3d 667, 671 (Tex. App.–Dallas 2012, no pet.). An expert cannot simply opine that the breach caused the injury. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539. Rather, the report must explain, to a reasonable degree, how and why the breach of the standard of care caused the injury based on the facts presented. *Van Ness*, 461 S.W.3d at 142; *Jelinek*, 328 S.W.3d at 539–40. The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.–Dallas 2010, no pet.) (expert report must contain sufficiently specific information to demonstrate causation beyond conjecture).

In determining whether the expert report represents a good faith effort to comply with the statutory requirements, the court's inquiry is limited to the four corners of the report. *Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 641 (Tex. App.–Dallas 2010, pet. denied) (citing *Palacios*, 46 S.W.3d at 878). "We may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Hollingsworth v. Springs,* 353 S.W.3d

506, 513 (Tex. App.–Dallas 2011, no pet.). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Ortiz*, 378 S.W.3d at 671.

**Discussion**

Dr. Davey opined that Pinecrest failed to prevent Bailey's pressure ulcer, treat it once it developed, maintain sufficient staffing levels, and implement policies to prevent Bailey's injuries. With regard to his theory that Pinecrest failed to prevent Bailey's pressure ulcer, Dr. Davey explained in his report that Bailey suffered from several preexisting conditions such as hypertension, congestive heart failure, diabetes mellitus, and asthma. Dr. Davey also stated in his report as follows:

> [A] facility and its nurses [should] ensure that a resident who is admitted without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that the sores were unavoidable and that a resident who develops pressure sores receives necessary treatment and services to promote healing, prevent infection, and prevent new sores from developing.

Pinecrest correctly argues that Dr. Davey did not discuss whether Bailey's preexisting conditions made her development of a pressure ulcer unavoidable. Therefore, he has not adequately demonstrated causation on this theory. *See, e.g.,* ***Christus Spohn Health Sys. Corp. v. Castro***, No. 13-13-00302-CV, 2013 WL 6576041, at *6 (Tex. App.—Corpus Christi Dec. 12, 2013, no pet.) (mem. op.) (holding that although allegation that nurse's failure to assess skin was sufficient in report, expert failed to explain role of patient's other complex medical conditions in developing pressure ulcer); ***Nexion Health at Southwood, Inc. v. Judalet***, No. 12-08-00464-CV, 2009 WL 3019717, at *4 (Tex. App.—Tyler Sept. 23, 2009, no pet.) (mem. op.) (holding expert report was insufficient on causation because expert failed to link conclusion that patient's earlier fall resulting in broken leg contributed to congestive heart failure and death and did not discuss role of other conditions in death). However, as we have noted, an expert report need only allege one viable theory to be sufficient under Chapter 74. *See* ***Certified EMS***, 392 S.W.3d at 632.

Dr. Davey separately opined that Pinecrest breached the standard of care by not only allowing the ulcer to develop, but also in "allowing the pressure ulcer to progress to a Stage IV," which caused Bailey's "soft tissues to become distorted and die." Dr. Davey stated that Bailey suffered injuries as a result. In other words, even if the pressure ulcer was unavoidable, Dr. Davey directly concluded that it was treatable once it appeared. He specifically tracked the

5

development of Bailey's ulcer while she was in Pinecrest's care, stating in relevant part as follows:

> On 8-12-13, the nursing staff at Pinecrest Nursing noted a 0.3 x 0.2 cm macerated area on Ms, Bailey's gluteal fold. The area of skin breakdown on Ms. Bailey's sacral area had developed a scant amount of serous exudate by 8-19-13, and nurses noted the area had "deteriorated."
>
> Several days later, on 8-22-13, a Stage II pressure ulcer was discovered on Ms. Bailey's sacral area that measured 1.0 x 0.3 cm and had a small amount of serous exudate present. Ms. Bailey began to experience a "continuous" and "aching" pain from her sacral ulcer on 9-3-13, and at this time, her Stage II pressure ulcer had increased in size to 0.8 x 1.0 x 0.2 cm. On 9-12-13, the nursing staff failed to stage the wound, but they noted measurements of 2.0 x 2.0 x 2.0 cm and the presence of serosanguineous drainage. By 9-17-13, Ms. Bailey had an unstageable pressure ulcer on her sacrum that measured 8.0 x 15.0 x >2.0 cm. According to the documentation in the weekly pressure ulcer record, the wound had a moderate amount of serosanguineous exudate and was causing Ms. Bailey a significant amount of pain.

On September 19, 2013, Bailey was transferred to TMF, and later to other care providers, in order to treat her pressure ulcers. Upon admission at TMF, she was diagnosed with a Stage IV sacral pressure ulcer. Hospital staff also determined that Bailey was malnourished.

In the standard of care section of Dr. Davey's report related to Pinecrest's failure to properly treat Bailey's pressure ulcer, he stated that Pinecrest should position the patient so that pressure on the ulcer is relieved, provide pressure relieving devices, keep the patient clean and dry, and properly nourish the patient through a diet that will encourage healing. Dr. Davey also stated that the pressure ulcer and surrounding skin should be cleansed at the time of each dressing change, or it is unlikely to heal. Finally, he stated that regular and complete assessments must be performed and documented so that the necessary interventions can be implemented.

In the breach section, Dr. Davey opined that Pinecrest failed to comply with these standards. He stated that once the skin breakdown was discovered on Bailey's sacrum, the nursing staff at Pinecrest should have been frequently monitoring the area, documenting any changes, and describing the progression of the wound. Instead, he continued, the nurses waited a week to reassess the area of skin breakdown, and by that time, it had deteriorated into a Stage II pressure ulcer. On September 12, 2013, the nurses assessed the ulcer as measuring 2.0 x 2.0 x 2.0 cm, but failed to stage it. Five days later, Bailey's ulcer had increased in size from 8.0 x 15.0 x >2.0 cm, and became unstageable. Dr. Davey explained that once an ulcer is unstageable, it means that the ulcer is at least Stage III or Stage IV. But since the ulcer is heavily covered in

6

necrotic tissue at that point, the healthcare providers cannot determine how deep the injury extends under the skin. Later that same day, according to Dr. Davey, the wound was assessed for the first time in the nursing notes, and the entry described the wound as "deteriorated," 100 percent necrotic, with measurements of 18.0 x 10.0 cm. According to the entry, the wound's depth could not be measured.

Dr. Davey explained further that proper assessment is necessary to treat the ulcer, and that measurement and accurate description of wounds is crucial to track a wound's progress and response to treatment. Proper assessment and prompt, accurate documentation and reporting inform the treating physicians and dieticians of the condition so that they can timely order and implement the proper interventions to treat the ulcer. According to Dr. Davey, based on his review of Bailey's medical records, Pinecrest's staff failed to regularly assess and accurately and consistently document the status and progression of the wound. Consequently, the attending physician was not timely notified of Bailey's worsening condition. Dr. Davey stated that a wound care consultation and treatments were not ordered until after Bailey's ulcer had developed a depth of 0.2 cm, which was indicative of a Stage III pressure ulcer. Aside from these orders, Dr. Davey explained, Bailey's pressure ulcer was never mentioned in any of the physician's progress notes or consultations. Dr. Davey opined that the nurses should have brought the wound and the fact that it was becoming necrotic to her physician's attention. The failure to do so, he stated, prevented the physician from determining the necessity of interventions such as a low air mattress or a wound consult.

Finally, in relation to Pinecrest's alleged failure to properly treat the ulcer, Dr. Davey opined that Pinecrest failed to adequately monitor Bailey's nutritional status and monitor her laboratory tests. Dr. Davey stated that there is an increased metabolic demand in healing a pressure ulcer, and that without monitoring her lab values, nursing staff were unaware of worsening albumin and pre-albumin levels. Dr. Davey stated that Bailey's lab values were not taken until September 19, 2013, the date of her discharge. Those values indicated that Bailey was malnourished. He acknowledged that a multivitamin was administered, but Pinecrest failed to provide other interventions such as snacks, fortified meals, or providing more frequent, smaller meals to address the increased metabolic demand and promote healing.

At the end of the breach section, Dr. Davey opined on causation and concluded that had Pinecrest's nurses complied with these standards of care, the proper interventions could have

7

been implemented before Bailey's pressure ulcer became unstageable, and ultimately progressed to a Stage IV ulcer when Bailey was discharged from Pinecrest and admitted at TMF. In the causation section of his report, Dr. Davey explained the nature of pressure ulcers and how they develop in the clinical setting. He stated that they develop when a patient has sustained pressure, often in combination with shear or friction, on soft tissues located over bony prominences. The pressure causes distortion in the soft tissues, which will result in a loss of blood flow through the vessels. Consequently, without nutrients, the tissue will become ischemic, and if sustained for a long enough period of time, necrosis of the tissue occurs.

Dr. Davey stated that the standards of care related to treatment are intended to prevent ulcers from progressing from a Stage I or Stage II wound to a Stage III or Stage IV wound. When allowed to progress to those stages, he continued, the patient will suffer a number of complications directly caused by the failure to assess and treat the ulcer. Specifically, he noted that the ulcer at those stages will cause skin loss with extensive destruction, necrosis, and damage to muscle, bone, tendons, and other supporting structures. He noted that such severe ulcers will make the patient become more susceptible to infection and other complications related to the wound and its treatment, including increased morbidity and a higher mortality rate. Finally, he stated that the patient will have problems with pain and loss of dignity associated with the wound and its treatment, particularly due to fluid leakage, smell, discomfort, difficulties with mobility, and a decrease in appetite. Based on the medical records, Dr. Davey opined that Bailey suffered all of these complications. He also stated that she was required to endure multiple surgical debridements, placement of a "wound VAC," and aggressive IV antibiotic therapy due to osteomyelitis and an infection with *Proteus mirabillis*.

Dr. Davey concluded that "to a reasonable degree of medical probability, the breaches of the standard of care identified above proximately caused Ms. Bailey's injuries, including the development of a Stage IV pressure ulcer." He separately stated as follows:

> In my opinion, to a reasonable degree of medical probability, the breaches of the standard of care discussed above related to the assessment, prevention, and treatment of severe pressure ulcers were the proximate cause of Ms. Bailey's severe pressure ulcer. As stated above, Pinecrest Nursing and its nursing staff failed to reposition Ms. Bailey every two hours, keep her skin clean and dry, and implement other appropriate interventions to relieve pressure and promote skin integrity. Pinecrest Nursing and its nursing staff also failed to properly treat the pressure ulcer and encourage its healing once it developed. Because Pinecrest Nursing failed to reposition her every two hours and failed to implement effective interventions, Ms. Bailey had sustained pressure on her sacral area, which caused the blood to stop flowing to that part of the body and the skin to

distort. Because of the lack of blood flow, the tissue died, causing Ms. Bailey to develop an infected Stage IV pressure ulcer.

Pinecrest argues that Dr. Davey failed to explain that absent Pinecrest's acts or omissions, the harm would not have occurred. It argues that Dr. Davey did not specifically identify the "interventions" or demonstrate how the failure to provide them caused harm to Bailey. Pinecrest also argues that Dr. Davey's reasoning is based on speculation or conjecture. We disagree.

We note that we review the entire report to determine the adequacy of the expert's opinion on causation. *See Ortiz*, 378 S.W.3d at 671. In reviewing the entire report, Dr. Davey explained the nature of pressure ulcers, that once they develop, the standard of care shifts from prevention to treatment, and that Pinecrest's nurses should timely and accurately assess, document, and report the progression of the pressure ulcer. The purpose of this standard of care is to notify the patient's care team so that the proper interventions can be timely provided to prevent progression to a Stage III or Stage IV pressure ulcer. As we have detailed above, Dr. Davey explained how Pinecrest failed in this regard. He also identified the "interventions" elsewhere in his report. For example, he stated that Pinecrest's staff should keep Bailey's skin clean and dry, reposition her every two hours, provide pressure relieving devices such as a low air mattress, and provide an appropriate diet. Dr. Davey concluded that these failures, in reasonable medical probability, caused Bailey's pressure ulcer to progress to a Stage IV wound. Dr. Davey adequately linked the facts alleged in his report to his conclusions.

Pinecrest claims that Bailey's medical records reflect no entries that she had been repositioned in her three years as a resident prior to the incident, yet Bailey did not develop a pressure ulcer until 2013. It contends that had she not been repositioned during that time period, she would have developed pressure ulcers much sooner. Thus, its argument continues, Dr. Davey speculated when he opined that the lack of entries related to repositioning meant she was not in fact repositioned. Pinecrest relies on authority stating that a medical expert's opinion cannot be based on speculation or conjecture, and must show more than the conduct possibly caused the harm. *See, e.g., Hutchinson v. Montemayor*, 144 S.W.3d 614, 618 (Tex. App.—San Antonio 2004, no pet.). While we agree with that statement of the law, the court in *Hutchinson* held that the expert's opinion that "[i]f an arteriogram had been done, there would have been a *possibility* that [the patient] *may* have had bypassable lesions and that the amputation *may have*

*been avoided*[,]" was insufficient. *See id.* at 617 (emphasis added). The court further held that his conclusion that there was a possibility of a better outcome was speculative. *See id.* Here, Dr. Davey opined that Pinecrest's nursing staff's failure to assess, document, and report the progression of the pressure ulcer directly caused her harm, because the interventions were not timely provided. Moreover, we are confined to the four corners of the report, and defer to the trial court's determination of the facts alleged in the report. *See* **Van Ness**, 461 S.W.3d at 144; **Palacios**, 46 S.W.3d at 878.

Dr. Davey explained that the basis for his opinion as to preventing the ulcer's advancement is the lack of entries in Bailey's records, because this prevented her treating physician and nutritionist from timely providing interventions. He explained that the standard of care requires that Pinecrest's staff track its progression and document it in the patient's records. Those entries were plainly absent according to Dr. Davey. To corroborate the lack of communication to the physician, Dr. Davey also explained that Bailey did not receive a wound care consultation or treatments until after the ulcer had progressed to Stage III, and that other than those orders, Bailey's ulcer was not mentioned in any of the physician's progress notes. By cross referencing these documents, and relying on his experience in practice treating pressure ulcers, he explained that "it is clear that the assessments, treatments, and interventions described above were not performed here." Bailey is not required to marshal all her evidence at this stage of the proceeding. *See* **Palacios**, 46 S.W.3d at 878-79. Pinecrest's theory that the interventions were in fact timely performed is an issue for trial.

Pinecrest also argues that Dr. Davey failed to discuss the fact that ulcers may develop and deteriorate very quickly in patients despite adequate care, and that Bailey continued to develop pressure ulcers even after she left Pinecrest. As we have discussed, we examine only the four corners of the report, giving deference to the trial court's resolution of the factual allegations in the report. *See* **Van Ness**, 461 S.W.3d at 144; **Palacios**, 46 S.W.3d at 878. As we have explained, Dr. Davey adequately linked his discussion of the facts in his report to the conclusion that Pinecrest's breach of the standard of care proximately caused Bailey's harm on at least one theory. Furthermore, by the time the other hospitals began treating it, the ulcer had already progressed to a Stage IV ulcer with necrosis. He explained that the basis for this theory was that Pinecrest failed to prevent it from becoming a Stage III or Stage IV. The other health care

10

providers' treatment of the wound after it had advanced to Stage IV is irrelevant at this stage of the proceeding to this particular theory asserted by the Baileys.

Finally, Pinecrest argues that although Dr. Davey contended that Bailey's Stage IV pressure ulcer contributed to her death, he did not opine, under the correct legal standard, that the ulcer was a "substantial factor" in her death. The Baileys sued Pinecrest only in their capacity as heirs, not in their individual capacities. Their petition specifically identifies only a survival cause of action. However, in the damages section, the Baileys averred that not only did Bailey suffer damages, but they did as well. The Baileys concede in their brief that they are seeking damages only under a survival cause of action for Bailey's damages, not their own damages under a wrongful death cause of action. In other words, the Baileys make no contention that Pinecrest's actions caused Bailey's death, even though Dr. Davey attempted to opine on that issue.

We hold that the trial court correctly concluded that Dr. Davey's report satisfies Chapter 74's requirements on at least one theory.[4] Consequently, Pinecrest's sole issue is overruled.

## DISPOSITION

Having overruled Pinecrest's sole issue, we *affirm* the trial court's order denying its motion to dismiss.

BRIAN HOYLE
Justice

Opinion delivered May 27, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

[4] Since we have held that the failure to treat theory was sufficiently alleged, we need not address the Baileys' remaining theories. *See Certified EMS*, 392 S.W.3d at 632.

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 27, 2016**

**NO. 12-14-00357-CV**

**PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER,**
Appellants
V.
**TASCO BAILEY, NATHAN BAILEY, CARLIE BAILEY, ROY BAILEY, BILL BAILEY, JAMES BAILEY, EARL BAILEY, MARY DUNLAP AND LICILLE MARTIN, AS HEIRS OF ARCHIE BAILEY,**
Appellees

Appeal from the 114th District Court

of Smith County, Texas (Tr.Ct.No. 14-0856-B)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the trial court's order.

It is therefore ORDERED, ADJUDGED and DECREED that the order denying Appellants' motion to dismiss of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellants, **PINECREST SNF, LLC D/B/A PINECREST NURSING & REHABILITATION CENTER,** for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*